UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEVEN P. MESSNER, on Behalf of Himself and All Others Similarly Situated, | Case No. 2:15-cv-05427-MAK |
| Plaintiff, | |
| v. | |
| USA TECHNOLOGIES, INC., STEPHEN P. HERBERT, DAVID F. DEMEDIO, and JAMES DUNCAN SMITH, | |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT
FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiff Ryan Fain ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") the following upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by USA Technologies, Inc. ("USA Technologies" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of the defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the Internet.

Lead Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons who purchased or otherwise acquired USA Technologies securities between November 14, 2014 and September 30, 2015, inclusive (the "Class Period"), seeking to recover damages for violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     USA Technologies provides wireless networking, cashless transactions, asset monitoring, and other value-added services principally to the small ticket unattended retail markets in the United States and internationally. The Company's products include ePort, a device that is

used in self-service and/or unattended markets such as vending machines, amusement parks, arcades, car washes, and kiosks to facilitate cashless payments. USA Technologies also manufactures and sells energy management products that reduce the electrical power consumption of equipment such as refrigerated vending machines and glass front coolers.

3.      Throughout the Class Period, defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) there were significant deficiencies in both the design and operating effectiveness of the company's internal control over financial reporting; (ii) the deficiencies, when aggregated, represented a material weakness in internal control; (iii) as a result of these deficiencies, the Company's procedures failed to identify a large number of uncollectible small balance accounts; and (iv) as a result of the foregoing, USA Technologies' public statements were materially false and misleading at all relevant times.

4.      On September 29, 2015, post-market, USA Technologies filed a Notification of Late Filing on Form 12b-25 with the SEC (the "Late Filing Notice"). In the Late Filing Notice, the Company announced that it was unable to file its annual report for the fiscal year ended June 30, 2015 on Form 10-K with the SEC (the "2015 Form 10-K"). The Company stated, in part:

> The Company's management assessed the effectiveness of its disclosure controls and procedures and internal control over financial reporting as of June 30, 2015. Based on its assessment, ***management identified deficiencies in both the design and operating effectiveness of the Company's internal control over financial reporting, which when aggregated represent a material weakness in internal control***. The most significant of these was the process over the reconcilement, analysis and management oversight of certain customer accounts receivable balances related to customer processing and service fees. The procedures in place did not identify a large number of small balance accounts that may be uncollectible and were not appropriately dispositioned, collected, remediated, reserved for and/or written-off. ***As a result, the Company changed its June 30, 2015 financial results included in its September 10, 2015 press release by increasing its bad debt reserve***

*by approximately $450 thousand resulting in an after-tax charge of approximately $270 thousand relating to these customer accounts receivable.* The Company is in the process of evaluating the material weakness and preparing the required disclosures.

(emphasis added)

5.     As discussed below, the Company's fourth-quarter and year-end earnings announcement for fiscal 2015 initially reported a bad debt expense of $158,716 for the first quarter of fiscal year 2015, $140,996 for the second quarter of fiscal year 2015, $302,632 for the third quarter of fiscal year 2015, and $47,184 for the fourth quarter of fiscal year 2015—totaling $649,528 for the fiscal year 2015.  Correcting the Company's September 10, 2015 press release, the 2015 10-K changed the bad debt expense materially, reporting a fiscal 2015 bad debt expense of $1,099,528, a $450,000 (*or approximately 69.3%*) increase in the aggregate bad debt expenses that the Company had previously reported.  In addition, the Company's restatement increased USA Technologies' net loss for the year by $270,000 (*or approximately 32%*) and decreased the Company's earnings-per-share for the year from ($0.04) to ($0.05).

6.     During the Class Period, USA Technologies' common stock price closed as high as $3.48 on July 16, 2015. In the wake of the Late Filing Notice, shares of USA Technologies dropped $0.39 from a closing price of $2.77 on September, 29, 2015, to close at $2.38 on October 1, 2015—nearly a 15% decline in the span of two trading days.

7.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. §1391(b), as defendant is headquartered in this District and a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Lead Plaintiff Ryan Fain purchased USA Technologies securities at artificially inflated prices during the Class Period and was damaged upon the revelation of defendants' fraud. Lead Plaintiff filed his certification evidencing his transactions previously with the Court in connection with his motion for appointment as Lead Plaintiff. (Dkt. No. 11-3) Lead Plaintiff's certification is incorporated herein by reference.

13.     Defendant USA Technologies was founded in 1992. The Company is a Delaware corporation with its principal executive offices located at 100 Deerfield Lane, Suite 140, Malvern, Pennsylvania 19355. USA Technologies' common stock trades on the NASDAQ under the ticker symbol "USAT".

14.     Defendant Stephen P. Herbert ("Herbert") has served at all relevant times as the Company's Chief Executive Officer, Chairman, and President.

15.     Defendant David M. DeMedio ("DeMedio") served as the Company's Chief Financial Officer ("CFO") from 2005 until August 31, 2015. DeMedio served as the Company's Chief Services Officer ("CSO") from August 2015 until he resigned effective October 14, 2015.

16.      Defendant James Duncan Smith ("Smith") has served as the Company's CFO since August 2015.

17.     The defendants referenced above in Paragraphs 15-17 are sometimes referred to herein as the "Individual Defendants."

18.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of USA Technologies' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

19.     USA Technologies is liable for the acts of Herbert, DeMedio, Smith, and its employees under the doctrine of respondeat superior and common law principles of agency as all

the wrongful act complained of herein were carried out within the scope of their employment with authorization.

20.     The scienter of Herbert, DeMedio, Smith, and other employees and agents of the Company are similarly imputed to USA Technologies under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

21.     USA Technologies provides wireless networking, cashless transactions, asset monitoring, and other value-added services principally to the small ticket unattended retail markets in the United States and internationally. The Company's products include ePort, a device that is used in self-service and/or unattended markets such as vending machines, amusement parks, arcades, car washes, and kiosks to facilitate cashless payments. USA Technologies also manufactures and sells energy management products that reduce the electrical power consumption of equipment such as refrigerated vending machines and glass front coolers.

22.     The Company derives the majority of its revenue from license and transaction fees resulting from connections to, as well as services provided by, its ePort Connect service. The majority of the Company's ePort Connect customers pay a monthly fee plus a blended transaction rate on the transaction dollar volume processed by the Company, making connections to the ePort Connect service the most significant driver of the Company's revenues, particularly revenues from license and transaction fees. According to the Company's 2015 Form 10-K, as of June 30 2015, the Company had approximately 333,000 connections to its ePort Connect services and had processed approximately 217 million cashless transactions totaling approximately $389 million in transaction dollars in fiscal year 2015. The Company's customers are primarily self-serve, small

ticket retail markets, including food and beverage vending and kiosk, commercial laundry, car wash, tolls, amusement and gaming, and office refreshments.

23.     The Company offers its ePort customers the option of two payment programs, its QuickStart Program and its JumpStart Program.

24.     Customers in the QuickStart Program entered into a five-year non-cancelable lease with the Company or a third-party leasing company for the devices, thereby reducing customers' upfront capital costs associated with purchasing ePort devices. At the end of the lease period, customers are allowed to purchase the device for a nominal fee.

25.     Customers in the JumpStart Program acquire an ePort cashless device at no upfront cost but pay a higher monthly service fee, thereby avoiding the need to make a major upfront capital investment. The Company continues to own the ePort devices utilized by its customers in the JumpStart Program. At the time of the shipment of the ePort device, the customer is obligated to pay to the Company a one-time activation fee, and is later obligated to pay monthly ePort Connect service fees in accordance with the terms of the customer's contract with the Company, in addition to transaction processing fees generated from the device.

26.     Since the introduction of the Company's QuickStart Program in September 2014, the percentage of the Company's customers who either lease their ePort device or purchase it outright has significantly increased to account for the overwhelming majority of the Company's gross connections. According to the 2015 Form 10-K, in fiscal year 2014, QuickStart Customers accounted for 65% of the Company's gross connections. In fiscal year 2015, customers who leased their devices through the Company's QuickStart Program or bought them outright accounted for 89% of the Company's gross connections. (*See* 2015 Form 10-K, p. 10.)

**B.      Management's Responsibility for Financial Reporting**

27.      Defendants represented in each of USA Technologies' periodic reports filed with the SEC on Forms 10-K and 10-Q that the financial statements therein conformed with generally accepted accounting principles ("GAAP"). (*See*, *e.g.*, Form 10-Q, filed May 15, 2015, p. 7.)

28.      GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. GAAP are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups that it established, the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB"). Effective July 1, 2009, the FASB issued the FASB Accounting Standards Codification ("ASC") which superseded all prior FAS Standards and FASB Staff Positions regarding FAS Standards. The ASC is "the source of authoritative [GAAP] recognized by the FASB to be applied by nongovernmental entities." (ASC, Topic 105, Sub-topic 10, § 5, ¶ 1.)

29.      SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

30.      Senior management is responsible for a company's financial reporting. The Code of Professional Conduct developed by the American Institute of Certified Public Accounts states in pertinent part:

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining an internal control structure that will, among other things, record, process, summarize, and report financial data that is consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

(1 CCH AICPA Professional Standards, SAS No. 1, § 110.02 (1982).)

31.     Section 13 of the Exchange Act confirms management's responsibilities for an entity's internal controls. "Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall- . . . devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that- . . . transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements . . . ." (15 U.S.C. § 77m(b)(2)(B)(ii)(I).)

32.     USA Technologies' management, including the Company's CEO and CFO, conducted evaluations of the effectiveness of USA Technologies' internal control over financial reporting based on the framework in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO Report"). The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. The term "reliable" as used in the COSO Report requires that financial statements prepared for external purposes are fairly presented in conformity with GAAP and regulatory

requirements. Inherent in the fair presentation of financial statements is the concept of statement materiality. Reliability of financial reporting applies to published financial statements, including interim and consolidated financial statements, and selected financial data, such as earnings releases, derived from these financial statements.

33.    An error in previously issued financial statements is an "error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of [GAAP], or oversight or misuse of facts that existed at the time the financial statements were prepared." A "retrospective application" is the "application of a different accounting principle to one or more previously issued financial statements . . . ." A "restatement" is the "process of revising previously issued financial statements to reflect the correction of an error in those financial statements." (ASC, Topic 250, Sub-topic 10, § 20.)

34.    Upon the discovery of an error in a previously issued financial statement, the "error . . . shall be reported as an error correction[] by restating the prior-period financial statements. Restatement requires all of the following: [a] The cumulative effect on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented[;] [b] An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period[;] [and] [c] Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error." (ASC, Topic 250, Sub-topic 10, § 45, ¶ 23.) Other circumstances requiring the revision of financial statements, neither of which are applicable here, include a change in the reporting entity or a change in an accounting principle. (ASC, Topic 250, Sub-topic 10, § 45.)

35.     Upon restating financial statements for the purpose of correcting an error, "the entity shall disclose that its previously issued financial statements have been restated, along with a description of the nature of the error. The entity also shall disclose both of the following: [a] The effect of the correction on each financial statement line item and any per-share amounts affected for each prior period presented [and] [b] The cumulative effect of the change on retained earnings or other appropriate components of equity or net assets in the statement of financial position . . . ." (ASC, Topic 250, Sub-topic 10, § 50, ¶ 7.)

36.     Restating financial statements dilute public confidence in the companies to which they belong. Further, restatements confuse those who use them. Consequently, financial statements prepared in accordance with GAAP should be considered final, and only restated for the purpose of correcting material errors. (ASC, Topic 105, Sub-topic 10, § 5, ¶ 6.)

**C.     USA Technologies Restates the Company's June 30, 2015 Financials**

37.     In this case, USA Technologies restated the fiscal year 2015 financial results it initially reported in the Company's fourth quarter and fiscal year 2015 earnings press release (the "4Q & FY 2015 Press Release"), issued on September 10, 2015. Specifically, on September 29, 2015, the Company filed a Notification of Late Filing on Form 12b-25 with the SEC (the "Late Filing Notice"), in which the Company disclosed that it had "increase[ed] its bad debt reserve by approximately $450 thousand, resulting in an after-tax charge of $270 thousand relating to these customer account receivables." (Notification of Late Filing on Form 12b-25, filed September 29, 2015.)

38.     The Company's CFO, Defendant Smith, further elaborated on the Company's accounting policies with regard to uncollected debt and its need to restate its fiscal year 2015,

during the Company's earnings conference call for the first quarter of fiscal year 2016. According to Smith:

> Before turning to our outlook, I would like to comment on the internal control matters that we have disclosed in the 10-K that was filed on September 30, '15. With regards to the analysis support and documentation around the allowance for the uncollected customer accounts that are not collected through our normal procedures, that process has been addressed and re-mediated and was in effect as of September 30.
>
> Additionally, we are changing the balance sheet classification in these uncollected accounts commencing in September 30 financial statements. **The uncollected customer accounts and the related allowance are no longer reflected in accounts payable, where they have been reflected on consistent basis in all prior periods and are now reflected in accounts receivable.** The new accounting classification is more appropriate now as the amounts have been outstanding for longer time periods and are larger in the aggregate that was anticipated in the accounting process was established many years ago.

(Earnings Call Transcript, November 13, 2015.)

39.   Under GAAP, a "bad debt allowance" is the appropriate method for accounting for bad debts. An allowance, in general terms, is an amount set aside for current or retained earnings in expectation of a potential future expense or reduction in asset value. An allowance for doubtful accounts represents management's best estimate of the amount of accounts receivable that will not be paid by customers, and offsets the amount of the company's accounts receivable to take into account the amount owed by customers or borrowers that the company expects to be ultimately uncollectable. Under the allowance method, the amount of doubtful debt is estimated in advance and is recognized before the debt is actually determined to be uncollectable. This amount is the company's "bad debt allowance," a contra-asset account, which is presented on the company's balance sheet by deducting it from the company's accounts receivable for the period.

40.   A "bad debt expense" refers to the amount a company actually loses during the period of as a result of uncollectable accounts. Regarding "bad debt expenses," the ASC states:

"The change in present value from one reporting period to the next may result not only from the passage of time but also from changes in estimates of the timing or amount of expected future cash flows. A creditor that measures impairment based on the present value of expected future cash flows is permitted to report the entire change in present value as bad-debt expense." (ASC, Topic 310, Sub-topic 10, § 45, ¶ 4.)

41.   By recording an allowance for doubtful accounts contemporaneously with corresponding sales records in a company's accounts receivable, the company is able to match its projected bad debt expense against the related sales thereby disclosing an accurate view of the true profitability of sales.

42.   However, "[a]sset valuation allowances for losses such as those on receivables and investments *shall be deducted from the assets or groups of assets to which those allowances relate*." (ASC, Topic 210, Sub-topic 10, § 45, ¶ 13 (emphasis added).) As such, GAAP requires companies to deduct any allowance for uncollectable debts from its accounts receivable in the asset column of its balance sheet.

43.   Prior to the issuing the Late Filing Notice, as discussed below, the Company was not disclosing the true amount of its bad debt expense, and was failing to properly reflect its uncollectible accounts in the figures it disclosed as accounts receivable. Indeed, CFO Defendant Smith, conceded the improprieties concerning the Company's prior accounting policies with regard to uncollected debt and its need to restate its fiscal year 2015 during the Company's earnings conference call on November 13, 2015. According to Smith:

> Before turning to our outlook, I would like to comment on the internal control matters that we have disclosed in the 10-K that was filed on September 30, '15. With regards to the analysis support and documentation around the allowance for the uncollected customer accounts that are not collected through our normal procedures, that process has been addressed and re-mediated and was in effect as of September 30.

Additionally, we are changing the balance sheet classification in these uncollected accounts commencing in September 30 financial statements. **The uncollected customer accounts and the related allowance are no longer reflected in accounts payable, where they have been reflected on consistent basis in all prior periods and are now reflected in accounts receivable.** The new accounting classification is more appropriate now as the amounts have been outstanding for longer time periods and are larger in the aggregate that was anticipated in the accounting process was established many years ago.

(Earnings Call Transcript, November 13, 2015.)

**D.      Defendants' Materially False and Misleading Statements**

44.      USA Technologies' public statements, press releases, and filings with the SEC contained false and misleading statements of material fact and omitted to state other material facts required to be stated in order to make statements therein not misleading. The omissions and misrepresentations within these statements related to: (i) USA Technologies' accounting practices and procedures concerning bad and doubtful debt; and (ii) the adequacy and efficacy of USA Technologies' internal controls over financial reporting. As alleged below, Defendants knew of these material issues, or at least ignored them and/or acted with deliberate recklessness when making the following statements.

*November 14, 2014 – Quarterly Report*

45.      USA Technologies filed its quarterly report Form 10-Q for the first quarter of fiscal year 2015 with the SEC on November 14, 2014 (the "Q1 2015 Form 10-Q"). Defendants Herbert and DeMedio each signed the Q1 2015 Form 10-Q on behalf of the Company.

46.      The Q1 2015 Form 10-Q reported **(i) accounts receivable for the quarter in the amount of $2,444,748, less an allowance for uncollectible accounts of $129,000; (ii) accounts payable for the courter in the quarter of $7,632,643; (iii) "bad debt expense" for the quarter**

**in the amount of $158,716; and (iv) a net loss for the quarter in the amount of $60,956, with a net loss per common share of $0.01.** (Q1 2015 Form 10-Q, pp. 3, 4 & 6.)

47.     In a section of the Q1 2015 Form 10-Q discussing the "Results of Operations" for the Company's first quarter of fiscal year 2015 compared to the first quarter of the previous fiscal year, the Q1 2015 Form 10-Q stated, in pertinent part:

> Gross profit ("GP") for the quarter ended September 30, 2014 was $3,135,238 compared to GP of $3,582,771 from the same quarter in the prior fiscal year, a decrease of $447,533, or 12%, of which $192,466 is attributable to license and transaction fees GP, and $255,067 of which is attributable to equipment sales GP. Overall gross profit margins decreased from 35% to 26% due to a decrease in license and transaction fee margins to 29%, from 36% in the prior corresponding fiscal quarter, and by a decrease in equipment sales margins to 11% from 30% in the prior corresponding fiscal quarter. License and transaction fees margins decreased due to $410,000 recognized in cost of services as an estimate to resolve a customer billing dispute, the impact of certain JumpStart connections added during the 2014 fiscal year with fee grace periods under sales incentives, as well as approximately $380,000 of quarterly net rent expense related to the Sale Leaseback transactions, which is approximately $90,000 higher than the quarterly depreciation the Company would have recorded on the ePorts, had the Sale Leaseback transactions not occurred. Also contributing to the decrease of license and transaction fee margins was the accrual of approximately $410,000 as an estimate in connection with a customer billing dispute as more fully described in Note 9. The decrease in equipment revenue margins is attributable to sales incentives offered with the reintroduction of our QuickStart Program in the quarter as well as having approximately $100,000 less in activation fees, which are a higher margin revenue source.
>
> Selling, general and administrative ("SG&A") expenses of $3,632,487 for the quarter ended September 30, 2014, increased by $337,143, or 10%, from the same quarter in the prior fiscal year; approximately $168,000, or 50% of the increase, were non-cash expenses. T**he overall increase in SG&A is attributable to** increases of approximately $164,000 in employee compensation and benefits expenses, **$132,000 in bad debt expense**, and $46,000 in travel related expense predominately as a result of increased sales and marketing related efforts, offset by a net decrease of $5,000 for various other expenses.

(Q1 2015 Form 10-Q, p. 20.)

48.     Regarding the Company's Liquidity and Capital Resources for the first quarter of fiscal year 2015, the Q1 2015 Form 10-Q went on to state, in pertinent part:

LIQUIDITY AND CAPITAL RESOURCES

For the three-month period ended September 30, 2014, net cash used by operating activities was $1,404,761 as a result of a net loss of $60,956 and net cash used in the change in operating assets and liabilities of $2,252,601, offset by net non-cash charges of $908,796. **Of the $908,796 of net non-cash items, the most significant during the three-month period were charges related to** depreciation of assets, **bad debt expense**, and the vesting and issuance of common stock and options for employee and director compensation, offset by the benefit for income taxes, the decrease in the fair value of warrant liabilities and the benefit related to the recognition of deferred gain from sale-leaseback transactions.

(Q1 2015 Form 10-Q, p. 21.)

49.   USA Technologies' Q1 2015 Form 10-Q assured investors of the effectiveness of

the Company's controls over financial reporting in the section titled "Item 4. Controls and

Procedures." The Q1 2015 Form 10-Q stated:

(a) Evaluation of disclosure controls and procedures.

The principal executive officer and principal financial officer have evaluated the Company's disclosure controls and procedures as of September 30, 2014. **Based on this evaluation, they conclude that the disclosure controls and procedures were effective to ensure that the information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms and to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the Company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.**

(b) Changes in internal control over financial reporting.

**There have been no changes during the quarter ended September 30, 2014 in the Company's internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, internal control over financial reporting.**

(Q1 2015 Form 10-Q, p. 23.)

50.     Further, in connection with USA Technologies' Q1 2015 Form 10-Q, Defendants Herbert and DeMedio each certified pursuant to SOX that they reviewed the Q1 2015 Form 10-Q. Specifically, Herbert and DeMedio each certified that:

1. I have reviewed this quarterly report on Form 10-Q of USA Technologies, Inc.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based upon such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the issuer's most recent fiscal quarter (the issuer's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect, the issuer's internal control over financial reporting; and

5. The issuer's other certifying officer and I have disclosed, based on our most recent evaluation, of internal control over financial reporting to the auditors and the audit committee of the issuer's board of directors (or persons performing the equivalent functions):

    a. **all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the issuer's ability to record, process, summarize and report financial information; and**

    b. **any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal control over financial reporting.**

(Q1 2015 Form 10-Q, Exs. 31.1 & 31.2.)

    51.    The statements in Paragraphs 47-51 above (indicated in bold-faced font) are false and/or materially misleading because they omitted that the Company was not accounting properly for its bad debt expenses. As admitted by Defendant Smith during the earnings conference call on November 13, 2015, USA Technologies' "uncollected customer accounts" had been included in the Company's "accounts payable," which was subsequently corrected by including them in the Company's "accounts receivable." These omissions were material to USA Technologies investors because the true facts would have altered the total mix of information available to investors when deciding to purchase USA Technologies stock.

    52.    Additionally, at the time of the Q1 2015 Form 10-Q, USA Technologies was in the midst of an ongoing trend involving the Company's bad debt expenses. From 2012 to 2013, the Company's bad debt expense increased from ($48,270) to $68,615; from 2013 to 2014, the Company's bad debt expense increased from $68,615 to $134,176; and, ultimately, from 2014 to 2015, the Company's bad debt expense increased from $134,176 to $1,099,528. Although the Company's bad debt expense had been steadily and materially increasing, USA Technologies omitted to disclose to investors that (i) a trend within the Company's bad debt expense existed and

(ii) the trend was expected to have a materially unfavorable impact on the Company's net income and/or earnings.  This information was required to be disclosed pursuant to Item 303 of Regulation S-K (17 C.F.R. 229.303) and, in any event, because it would have altered the total mix of information available to investors when deciding to purchase USA Technologies stock.

<u>*November 14, 2014 – Press Release*</u>

53.     USA Technologies issued a press release disclosing its first quarter earnings results for fiscal year 2015 on November 14, 2014 (the "Q1 2015 Press Release"). USA Technologies filed a copy of the Q1 2015 Press Release as an exhibit to a Form 8-K with the SEC on November 18, 2014.

54.     For the first quarter of fiscal year 2015, the Q1 2015 Press Release reported **(i) accounts receivable for the quarter in the amount of $2,444,748, less an allowance for uncollectible accounts of $129,000; (ii) accounts payable for the courter in the quarter of $7,632,643; (iii) "bad debt expense" for the three months ended September 30, 2014 in the amount of $158,716; and (iv) a net loss for the quarter in the amount of $60,956, with a net loss per common share of $0.01.** (Q1 2015 Press Release.)

55.     The statements in Paragraph 55 above (indicated in bold-faced font) are false and/or materially misleading because they omitted that the Company was not accounting properly for its bad debt expenses.  As admitted by Defendant Smith during the earnings conference call on November 13, 2015, USA Technologies' "uncollected customer accounts" had been included in the Company's "accounts payable," which was subsequently corrected by including them in the Company's "accounts receivable." These omissions were material to USA Technologies investors because the true facts would have altered the total mix of information available to investors when deciding to purchase USA Technologies stock.

*November 14, 2014 – Earnings Conference Call*

56.     On November 14, 2015, Defendants Herbert and DeMedio held an earnings conference call on behalf of the Company (the "Q1 2015 Earnings Call").

57.     During the Q1 2015 Earnings Call, Defendant DeMedio discussed the Company's financial results for the quarter, including its operating expenses. Specifically DeMedio stated, in pertinent part:

> Gross profit was 3.1 million compared to 3.5 million in the year ago quarter. Total gross margin was 25.6% compared to 35.4% in the first quarter last year. Gross margin on license and transaction fees was 28.6% compared to 36.4% last year. The most significant item impacting both total gross margins, and license, and transaction fee gross margins was the one-time charge of $410,000 related to the customer dispute previously discussed.
>
> [. . .]
>
> Selling, general and administrative expenses were $3.6 million in the first quarters compared to 3.3 million in the year ago quarter, a 9.1% increase. **Approximately half of the $0.3 million increase is due to non-cash expenses related predominantly to an increase in the reserve for doubtful accounts and equity-related compensation.**

(Earnings Call Transcript, November 14, 2014.)

58.     Later during the Q1 2015 Earnings Call, in response to an analyst's question regarding the Company's "assumptions" for selling, general and administrative ("SG&A") expenses for the remainder of the 2015 fiscal year, DeMedio responded:

> SG&A expenses, as you remember our last call they were upward of little over 4 million and I had indicated that they would come down this fiscal quarter. They came down to around 3.6 million. I expected SG&A to slowly grow through the fiscal year. We're going to continue to invest in sales and marketing activity predominantly. **I don't expect SG&A to significantly ramp. It would ramp a little bit or grow a little bit from the 3.6 million through the fiscal, the remaining fiscal year, and again, predominately in the sales and marketing activity**.

(Earnings Call Transcript, November 14, 2014.)

21

59.     The statements in Paragraphs 58-59 above (indicated in bold-faced font) are false and/or materially misleading because they omitted that the Company was not accounting properly for its bad debt expenses.  As admitted by Defendant Smith during the earnings conference call on November 13, 2015, USA Technologies' "uncollected customer accounts" had been included in the Company's "accounts payable," which was subsequently corrected by including them in the Company's "accounts receivable." These omissions were material to USA Technologies investors because the true facts would have altered the total mix of information available to investors when deciding to purchase USA Technologies stock.

*February 17, 2015 – Quarterly Report*

60.     On February 17, 2015, USA Technologies filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended December 31, 2014 (the "Q2 2015 Form 10-Q"). Defendants Herbert and DeMedio signed the Q2 2015 Form 10-Q on behalf of the Company.

61.     For the second quarter of fiscal year 2015, the Q2 Form 2015 Form 10-Q, the Company reported **(i) accounts receivable for the quarter in the amount of $2,758,475, less an allowance for uncollectible accounts of $197,000; (ii) accounts payable for the courter in the quarter of $5,385,822; (iii) "bad debt expense" in the quarter in the amount of $140,996; and (iv) a net loss for the quarter in the amount of $260,915, with a net loss per common share of $0.01.** (Q2 2015 Form 10-Q, pp. 3, 4 & 6.)

62.     In a section of the Q2 2015 Form 10-Q discussing the "Results of Operations" for the Company's second quarter of fiscal year 2015 compared to the second quarter of the previous fiscal year, the Q2 2015 Form 10-Q stated, in pertinent part:

> Gross profit ("GP") for the quarter ended December 31, 2014 was $3,733,256 compared to GP of $3,830,133 from the same quarter in the prior fiscal year, a

decrease of $96,877, or 3%, of which $242,833 is attributable to a decrease in equipment sales GP, offset by an increase of $145,956 attributable to license and transaction fees GP. Overall gross profit margins decreased from 36% to 29% due to a decrease in license and transaction fee margins to 32%, from 37% in the prior corresponding fiscal quarter, and by a decrease in equipment sales margins to 18% from 34% in the prior corresponding fiscal quarter. License and transaction fees margins decreased due to the impact of certain JumpStart connections added during the 2014 fiscal year with fee grace periods under sales incentives, as well as approximately $445,000 of quarterly net rent expense related to the Sale Leaseback transactions, which is approximately $155,000 higher than the quarterly depreciation the Company would have recorded on the ePorts, had the Sale Leaseback transactions not occurred. The decrease in equipment revenue margins is attributable to sales incentives offered with the QuickStart Program as well as having approximately $295,000 less in activation fees, which are a higher margin revenue source and which to date are not part of the QuickStart Program.

Selling, general and administrative ("SG&A") expenses of $3,530,064 for the quarter ended December 31, 2014, increased by $336,496, or 11%, from the same quarter in the prior fiscal year; approximately $172,000, or 51% of the increase, were non-cash expenses. **The overall increase in SG&A is attributable to increases** of approximately $198,000 in employee compensation and benefits expenses, **$89,000 in bad debt estimates**, and $75,000 in research and development expenses, offset by a net decrease of $26,000 for various other expenses.

(Q2 2015 Form 10-Q, p. 19.)

63.     In discussing the "Results of Operations" for the Company's first six months of fiscal year 2015 compared to the first six months of the previous fiscal year, the Q2 2015 Form 10-Q stated, in pertinent part:

Gross profit ("GP") for the six months ended December 31, 2014 was $6,868,494 compared to GP of $7,412,904 from the same six month period in the prior fiscal year, a decrease of $544,410, or 7%, of which $497,900 is attributable to license and transaction fees GP, and $46,510 of which is attributable to equipment sales GP. Overall gross profit margins decreased from 36% to 27% due to a decrease in license and transaction fee margins to 30%, from 37% in the prior corresponding fiscal six month period, and by a decrease in equipment sales margins to 14% from 32% in the prior corresponding fiscal six month period. License and transaction fees margins decreased due to the impact of certain JumpStart connections added during the 2014 fiscal year with fee grace periods under sales incentives, as well as approximately $825,000 of six months of net rent expense related to the Sale Leaseback transactions, which is approximately $246,000 higher than the depreciation the Company would have recorded on the ePorts during the six month period, had the Sale Leaseback transactions not occurred. Also contributing

to the decrease of license and transaction fee margins was the recognition of approximately $410,000 in connection with a customer billing dispute as more fully described in Note 9 to our consolidated financial statements. The decrease in equipment revenue margins is attributable to sales incentives offered with the QuickStart Program as well as having approximately $275,000 less in activation fees, which are a higher margin revenue source which to date are not part of the QuickStart Program.

Selling, general and administrative ("SG&A") expenses of $7,162,551 for the six months ended December 31, 2014, increased by $673,639, or 10%, from the same six months in the prior fiscal year; approximately $341,000, or 51% of the increase, were non-cash expenses. **The overall increase in SG&A is attributable to increases of** approximately $363,000 in employee compensation and benefits expenses, **$205,000 in bad debt estimates**, $67,000 in utility and insurance expenses, and by a net increase of $39,000 for various other expenses.

(Q2 2015 Form 10-Q, p. 23.)

64.     USA Technologies' Q2 2015 Form 10-Q assured investors of the effectiveness of the Company's controls over financial reporting in the section titled "Item 4. Controls and Procedures." Specifically, the Q2 2015 Form 10-Q stated:

(a) Evaluation of disclosure controls and procedures.

The principal executive officer and principal financial officer have evaluated the Company's disclosure controls and procedures as of December 31, 2014. **Based on this evaluation, they conclude that the disclosure controls and procedures were effective to ensure that the information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms and to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the Company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.**

(b) Changes in internal control over financial reporting.

**There have been no changes during the quarter ended December 31, 2014 in the Company's internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, internal control over financial reporting.**

(Q2 2015 Form 10-Q, p. 23.)

65.    Further, in connection with USA Technologies' Q2 2015 Form 10-Q, Defendants

Herbert and DeMedio each certified pursuant to SOX that they reviewed the Q2 2015 Form 10-

Q. Specifically, Herbert and DeMedio each certified that:

1. I have reviewed this quarterly report on Form 10-Q of USA Technologies, Inc.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based upon such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the issuer's most recent fiscal quarter (the issuer's fourth fiscal quarter in the case of an annual report) that has

materially affected or is reasonably likely to materially affect, the issuer's internal control over financial reporting; and

5. The issuer's other certifying officer and I have disclosed, based on our most recent evaluation, of internal control over financial reporting to the auditors and the audit committee of the issuer's board of directors (or persons performing the equivalent functions):

    a. **all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the issuer's ability to record, process, summarize and report financial information; and**

    b. **any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal control over financial reporting**

(Q2 2015 Form 10-Q, Exs. 31.1 & 31.2.)

66.    The statements in Paragraphs 62-66 above (indicated in bold-faced font) are false and/or materially misleading because they omitted that the Company was not accounting properly for its bad debt expenses.  As admitted by Defendant Smith during the earnings conference call on November 13, 2015, USA Technologies' "uncollected customer accounts" had been included in the Company's "accounts payable," which was subsequently corrected by including them in the Company's "accounts receivable." These omissions were material to USA Technologies investors because the true facts would have altered the total mix of information available to investors when deciding to purchase USA Technologies stock.

67.    Additionally, at the time of the Q2 2015 Form 10-Q, USA Technologies was in the midst of an ongoing trend involving the Company's bad debt expenses.  From 2012 to 2013, the Company's bad debt expense increased from ($48,270) to $68,615; from 2013 to 2014, the Company's bad debt expense increased from $68,615 to $134,176; and, ultimately, from 2014 to 2015, the Company's bad debt expense increased from $134,176 to $1,099,528.  Although the Company's bad debt expense had been steadily and materially increasing, USA Technologies

omitted to disclose to investors that (i) a trend within the Company's bad debt expense existed and (ii) the trend was expected to have a materially unfavorable impact on the Company's net income and/or earnings.  This information was required to be disclosed pursuant to Item 303 of Regulation S-K (17 C.F.R. 229.303) and, in any event, because it would have altered the total mix of information available to investors when deciding to purchase USA Technologies stock.

<em>February 17, 2015 – Press Release</em>

68.     USA Technologies issued a press release disclosing its second quarter earnings results for fiscal year 2015 on February 17, 2015 (the "Q2 2015 Press Release"). USA Technologies filed a copy of the Q2 2015 Press Release as an exhibit to a Form 8-K with the SEC on February 19, 2015.

69.      For the second quarter of fiscal year 2015, the Q2 2015 Press Release reported **(i) accounts receivable for the quarter in the amount of $2,758,475, less an allowance for uncollectible accounts of $197,000; (ii) accounts payable for the courter in the quarter of $5,385,822; (iii) "bad debt expense" in the quarter in the amount of $140,996; and (iv) a net loss for the quarter in the amount of $260,915, with a net loss per common share of $0.01.** (Q2 2015 Press Release.)

70.     The statements in Paragraph 69 above (indicated in bold-faced font) are false and/or materially misleading because they omitted that the Company was not accounting properly for its bad debt expenses.  As admitted by Defendant Smith during the earnings conference call on November 13, 2015, USA Technologies' "uncollected customer accounts" had been included in the Company's "accounts payable," which was subsequently corrected by including them in the Company's "accounts receivable." These omissions were material to USA Technologies investors

because the true facts would have altered the total mix of information available to investors when deciding to purchase USA Technologies stock.

<u>*February 17, 2015 - Earnings Conference Call*</u>

71.     On February 17, 2015, Defendants Herbert and DeMedio held an earnings conference call on behalf of the Company to discuss the earnings reports that the Company had released that day for the second quarter of fiscal year 2015 (the "Q2 2015 Earnings Call").

72.     During the Q2 2015 Earnings Call, Defendant DeMedio discussed the Company's financial results for the quarter, including its operating expenses. Specifically, DeMedio stated, in pertinent part:

> Gross profit for the quarter was $3.7 million compared to $3.8 million in the year-ago quarter. Total gross margin was 29% compared to 36% in the second quarter last year. Gross margin on license and transaction fees was 32% compared to 37% last year.
>
> [. . .]
>
> **Selling, general, and administrative expenses were $3.5 million in the second quarter compared to $3.2 million in the year-ago quarter, a 10.5% increase with approximately 50% of the increase due to noncash expenses such as equity related compensation and the reserve for doubtful accounts.**

(Earnings Call Transcript, February 17, 2015.)

73.     The statements in Paragraph 72 above (indicated in bold-faced font) are false and/or materially misleading because they omitted that the Company was not accounting properly for its bad debt expenses.  As admitted by Defendant Smith during the earnings conference call on November 13, 2015, USA Technologies' "uncollected customer accounts" had been included in the Company's "accounts payable," which was subsequently corrected by including them in the Company's "accounts receivable." These omissions were material to USA Technologies investors because the true facts would have altered the total mix of information available to investors when deciding to purchase USA Technologies stock

*May 11, 2015 - Press Release*

74.     USA Technologies issued a press release disclosing its third quarter earnings results for fiscal year 2015 on May 11, 2015 (the "Q3 2015 Press Release"). USA Technologies filed a copy of the Q3 2015 Press Release as an exhibit to a Form 8-K with the SEC on the May 15, 2015.

75.     For the third quarter of fiscal year 2015, the Q3 2015 Press Release reported **(i) accounts receivable for the quarter in the amount of $3,403,489 less an allowance for uncollectible accounts of $493,000; (ii) accounts payable for the courter in the quarter of $5,208,646; (iii) "bad debt expense" in the quarter in the amount of $302,632; and (iv) a net loss for the quarter in the amount of $566,610, with a net loss per common share of $0.03.** (Q3 2015 Press Release.)

76.     The statements in Paragraph 76 above (indicated in bold-faced font) are false and/or materially misleading because they omitted that the Company was not accounting properly for its bad debt expenses.  As admitted by Defendant Smith during the earnings conference call on November 13, 2015, USA Technologies' "uncollected customer accounts" had been included in the Company's "accounts payable," which was subsequently corrected by including them in the Company's "accounts receivable." These omissions were material to USA Technologies investors because the true facts would have altered the total mix of information available to investors when deciding to purchase USA Technologies stock.

*May 11, 2015 – Earnings Conference Call*

77.     On May 11, 2015, Defendants Herbert and DeMedio held an earnings conference call on behalf of the Company to discuss the earnings reports that the Company had released that day for the third quarter of fiscal year 2015 (the "Q3 2015 Earnings Call").

78.     During the Q3 2015 Earnings Call, Defendant DeMedio discussed the Company's

financial results for the quarter, including its operating expenses. Specifically, DeMedio stated, in

pertinent part:

> Gross profit was $5.1 million compared to $4 million in the year ago quarter. Total
> gross margin was 33.5% compared to 38.3% in the third quarter last year. Gross
> margin on license and transaction fees was 35.3%, compared to 35.7% last year and
> up sequentially from this year's second fiscal quarter's margin of 31.7%.
>
> [. . .]
>
> Selling, general and administrative expenses were $4.3 million in the third quarter,
> compared to $3.5 million in the year ago quarter, a 23% increase. **The increase is
> the result of approximately $0.3 million increase in the reserve for doubtful
> accounts**, approximately $3.3 million related to an increased compensation
> expense of which 50% is due to non-cash equity related compensation. And the
> remaining approximately $0.2 million predominantly relates to an increase in the
> use of outside and/or consulting services.

(Earnings Call Transcript, February 17, 2015.)

79.     Later during the Q3 2015 Earnings Call, DeMedio respond to market analyst Mike

Latimore's inquiry regarding the Company's SG&A expenses for the quarter. Specifically,

DeMedio stated:

> <u>Mike Latimore</u>: Okay, great. SG&A, is that kind of the quarter amount here, is that
> a good run rate going forward, SG&A?
>
> <u>Dave DeMedio</u>**: Mike, no. Of that 4.2, I would estimate 350,000 to 400,000 is
> sort of one-time for this quarter.**

(Earnings Call Transcript, February 17, 2015.)

80.     The statements in Paragraphs 79-80 above (indicated in bold-faced font) are false

and/or materially misleading because they omitted that the Company was not accounting properly

for its bad debt expenses.  As admitted by Defendant Smith during the earnings conference call on

November 13, 2015, USA Technologies' "uncollected customer accounts" had been included in

the Company's "accounts payable," which was subsequently corrected by including them in the

Company's "accounts receivable." These omissions were material to USA Technologies investors because the true facts would have altered the total mix of information available to investors when deciding to purchase USA Technologies stock.

*May 15, 2015 – Quarterly Report*

81.     On May 15, 2015, USA Technologies filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q3 2015 Form 10-Q").  Defendants Herbert and DeMedio signed the Q3 2015 Form 10-Q on behalf of the Company.

82.     For the third quarter of fiscal year 2015, the Q3 2015 Form 10-Q, the Company reported **(i) accounts receivable for the quarter in the amount of $3,403,489 less an allowance for uncollectible accounts of $493,000; (ii) accounts payable for the courter in the quarter of $5,208,646; (iii) "bad debt expense" in the quarter in the amount of $302,632; and (iv) a net loss for the quarter in the amount of $566,610, with a net loss per common share of $0.03.** (Q3 2015 Form 10-Q, pp. 3, 4 & 6.)

83.     In a section of the Q3 2015 Form 10-Q discussing the "Results of Operations" for the Company's third quarter of fiscal year 2015 compared to the same period of the previous fiscal year, the Q3 2015 Form 10-Q stated, in pertinent part:

> Selling, general and administrative ("SG&A") expenses of $4,279,888 for the quarter ended March 31, 2015, increased by $800,588, or 23%, from the same quarter in the prior fiscal year; approximately $466,000, or 58% of the increase, were non-cash expenses. **The overall increase in SG&A is attributable to increases of approximately $314,000 in bad debt estimates**, $301,000 in employee compensation and benefits expenses, and $234,000 in consulting and professional services, offset by a net decrease of $48,000 for various other expenses.

(Q3 2015 Form 10-Q, p. 20.)

84.    In discussing the "Results of Operations" for the Company's first three quarters of fiscal year 2015 compared to the same period of the previous fiscal year, the Q3 2015 Form 10-Q stated, in pertinent part:

> Selling, general and administrative ("SG&A") expenses of $11,442,439 for the nine months ended March 31, 2015, increased by $1,474,227 or 15%, from the same nine months in the prior fiscal year; approximately $807,000, or 55% of the increase, were non-cash expenses. **The overall increase in SG&A is attributable to increases of approximately** $670,000 in employee and director compensation and benefits expenses, **$536,000 in bad debt estimates**, $230,000 in consulting and professional services, and by a net increase of $38,000 for various other expenses.

(Q3 2015 Form 10-Q, p. 24.)

85.    Regarding the Company's Liquidity and Capital Resources for the first three quarters of fiscal year 2015, the Q3 2015 Form 10-Q went on to state, in pertinent part:

> LIQUIDITY AND CAPITAL RESOURCES
>
> For the nine months ended March 31, 2015, net cash used in operating activities was $4,378,897 as a result of a net loss of $888,481 and net cash used in the change in operating assets and liabilities of $9,192,083, offset by net non-cash charges of $5,701,667. **Of the $5,701,667 of net non-cash items, the most significant during the nine month period were charges related to depreciation of assets, increase in the fair value of warrant liabilities, bad debt expense, and the vesting and issuance of common stock and options for employee and director compensation, offset by the benefit related to the recognition of deferred gain from sale-leaseback transactions**. The cash used in the $9,192,083 change in the Company's operating assets and liabilities was primarily the result of increases in finance and trade receivables and inventory and decreases in accounts payable. The increase in finance receivables was directly related to the reintroduction of the QuickStart Program in September 2014. The increase in inventory was primarily attributable to the reclassification of JumpStart rental program equipment to inventory.

(Q3 2015 Form 10-Q, p. 26.)

86.    USA Technologies' Q2 2015 Form 10-Q assured investors of the effectiveness of the Company's controls over financial reporting in the section titled "Item 4. Controls and Procedures." Specifically, the Q2 2015 Form 10-Q stated:

> (a) Evaluation of disclosure controls and procedures.

The principal executive officer and principal financial officer have evaluated the Company's disclosure controls and procedures as of March 31, 2015. **Based on this evaluation, they conclude that the disclosure controls and procedures were effective to ensure that the information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms and to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the Company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.**

(b) Changes in internal control over financial reporting.

**There have been no changes during the quarter ended March 31, 2015 in the Company's internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, internal control over financial reporting.**

(Q3 2015 Form 10-Q, p. 28.)

87.     Further, in connection with USA Technologies' Q3 2015 Form 10-Q, Defendants Herbert and DeMedio each certified pursuant to SOX that they reviewed the Q3 2015 Form 10-Q. Specifically, Herbert and DeMedio each certified that:

1. I have reviewed this quarterly report on Form 10-Q of USA Technologies, Inc.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based upon such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the issuer's most recent fiscal quarter (the issuer's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect, the issuer's internal control over financial reporting; and

5. The issuer's other certifying officer and I have disclosed, based on our most recent evaluation, of internal control over financial reporting to the auditors and the audit committee of the issuer's board of directors (or persons performing the equivalent functions):

a. **all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the issuer's ability to record, process, summarize and report financial information; and**

b. **any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal control over financial reporting.**

(Q3 2015 Form 10-Q, Exs. 31.1 & 31.2.)

88.    The statements in Paragraphs 83-88 above (indicated in bold-faced font) are false and/or materially misleading because they omitted that the Company was not accounting properly for its bad debt expenses.  As admitted by Defendant Smith during the earnings conference call on

November 13, 2015, USA Technologies' "uncollected customer accounts" had been included in the Company's "accounts payable," which was subsequently corrected by including them in the Company's "accounts receivable." These omissions were material to USA Technologies investors because the true facts would have altered the total mix of information available to investors when deciding to purchase USA Technologies stock.

89.     Additionally, at the time of the Q3 2015 Form 10-Q, USA Technologies was in the midst of an ongoing trend involving the Company's bad debt expenses.  From 2012 to 2013, the Company's bad debt expense increased from ($48,270) to $68,615; from 2013 to 2014, the Company's bad debt expense increased from $68,615 to $134,176; and, ultimately, from 2014 to 2015, the Company's bad debt expense increased from $134,176 to $1,099,528.  Although the Company's bad debt expense had been steadily and materially increasing, USA Technologies omitted to disclose to investors that (i) a trend within the Company's bad debt expense existed and (ii) the trend was expected to have a materially unfavorable impact on the Company's net income and/or earnings.  This information was required to be disclosed pursuant to Item 303 of Regulation S-K (17 C.F.R. 229.303) and, in any event, because it would have altered the total mix of information available to investors when deciding to purchase USA Technologies stock.

*September 10, 2015 – Earnings Release*

90.     On September 10, 2015, USA Technologies issued a press release (the "4Q & FY 2015 Press Release"), which was subsequently filed on a Form 8-K with the SEC on September 11, 2015.

91.     The Q4 & FY 2015 Press Release reported USA Technologies financial earnings for the quarter and year ended June 30, 2015.  Among the information reported, were the following

figures concerning the Company's fourth-quarter and year-end bad debt expense, net income, and earnings-per-share:

| USA Technologies Q4 & FY 2015 Financial Earnings | | |
|---|---|---|
| | Three months ended June 30, 2015 | Year ended June 30, 2015 |
| Bad debt expense | $47,184 | $649,528 |
| Net income | $68,999 | ($819,482) |
| Net earnings (loss) per common share - diluted | ($0.01) | ($0.04) |

(Q4 & FY 2015 Press Release, pp. 6-8.)

92.     The financial figures reported in the Q4 & FY 2015 Press Release (as reported above in Paragraph 92) were false and/or materially misleading because they omitted that the Company was not accounting properly for its bad debt expenses.  As admitted by Defendant Smith during the earnings conference call on November 13, 2015, USA Technologies' "uncollected customer accounts" had been included in the Company's "accounts payable," which was subsequently corrected by including them in the Company's "accounts receivable." Further, according to the Company's annual report (Form 10-K) dated September 30, 2015, USA Technologies' bad debt expense, net income, and earnings-per-share for the quarter and year ended June 30, 2015 were as follows:

| USA Technologies Q4 & FY 2015 Financial Earnings – Restated | | |
|---|---|---|
| | Three months ended June 30, 2015[1] | Year ended June 30, 2015 |
| Bad debt expense | $479,184 | $1,099,528 |
| Net income | ($201,001) | ($1,089,482) |
| Net earnings (loss) per common share - diluted | ($0.01) | ($0.05) |

---

[1] USA Technologies' restated financial earnings for the three months ended June 30, 2015 are taken from the Company's amended current report (Form 8-K/A) dated September 30, 2015 and filed with the SEC on October 1, 2015 and signed by Defendant Herbert.

93.    These misleading statements and/or omissions were material to USA Technologies investors because the true facts would have altered the total mix of information available to investors when deciding to purchase USA Technologies stock.

**E.    USA Technologies Reveals the Truth and Investors Sustain Significant Damages**

94.    On September 29, 2015, post-market, the USA Technologies filed the Late Filing Notice. In the Late Filing Notice, the Company announced that it was unable to file the 2015 Form 10-K. The Company stated, in part:

> The Company's management assessed the effectiveness of its disclosure controls and procedures and internal control over financial reporting as of June 30, 2015. Based on its assessment, **management identified deficiencies in both the design and operating effectiveness of the Company's internal control over financial reporting, which when aggregated represent a material weakness in internal control**. The most significant of these was the process over the reconcilement, analysis and management oversight of certain customer accounts receivable balances related to customer processing and service fees. **The procedures in place did not identify a large number of small balance accounts that may be uncollectible and were not appropriately dispositioned, collected, remediated, reserved for and/or written-off. As a result, the Company changed its June 30, 2015 financial results included in its September 10, 2015 press release by increasing its bad debt reserve by approximately $450 thousand resulting in an after-tax charge of approximately $270 thousand relating to these customer accounts receivable.** The Company is in the process of evaluating the material weakness and preparing the required disclosures.

(Notification of Late Filing on Form 12b-25, filed September 29, 2015.)

95.    The following day, USA Technologies filed the 2015 Form 10-K with the SEC on September 30, 2015. Defendant Herbert signed the 2015 Form 10-K on behalf of the Company.

96.    The 2015 Form 10-K further and fully revealed the details surrounding the Company's "material weakness" within its internal controls over financial reporting. Within the 2015 Form 10-K's "Notes to Consolidated Financial Statements," in a section titled "Item 9A. Controls and Procedures," USA Technologies stated, in pertinent part:

(b) Management's annual report on internal control over financial reporting.

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Exchange Act Rules 13a-15(f). The Company's internal control over financial reporting is a process affected by the Company's management to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's financial statements for external purposes in accordance with U.S. generally accepted accounting principles.

In designing and evaluating our internal controls and procedures, our management recognized that internal controls and procedures, no matter how well conceived and operated, can provide only a reasonable, not absolute, assurance that the objectives of the internal controls and procedures are met.

The Company's management assessed the effectiveness of its internal control over financial reporting as of June 30, 2015. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations (COSO) of the Treadway Commission's 2013 Internal Control—Integrated Framework. Based on its assessment, management identified deficiencies in both the design and operating effectiveness of the Company's internal control over financial reporting, which when aggregated, represent a material weakness in internal control. The most significant of these was the process over the reconcilement, analysis and management oversight of certain customer accounts receivable balances related to customer processing and service fees. The procedures in place did not identify a large number of small balance accounts that may be uncollectible and were not appropriately dispositioned, collected, remediated, reserved-for and/or written-off. As a result, the Company changed its June 30, 2015 financial results included in its September 10, 2015 press release by increasing its bad debt reserve by approximately $450,000, resulting in an after-tax charge of approximately $270,000 relating to these customer accounts receivable. A material weakness is a deficiency or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. As a result of this material weakness, management concluded that the Company did not maintain effective control over financial reporting as of June 30, 2015.

The Company's internal controls over financial reporting with respect to the reconcilement, analysis and management oversight of certain customer accounts receivable balances are being evaluated and will be adjusted appropriately and remediated as soon as is practical.

This annual report does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's registered public accounting firm pursuant to an exemption for smaller reporting

companies under Section 989G of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

(c) Changes in internal control over financial reporting.

There have been no changes during the quarter ended June 30, 2015 in the Company's internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, internal control over financial reporting except those reported in section 9 A (b) above.

(2015 Form 10-K, p. 32.)

97.     The 2015 Form 10-K reported a bad debt expense for the fiscal year 2015 of $1,099,528, which represented a nearly 70% increase in the Company's aggregate bad debt expenses for fiscal year 2015.

98.     Furthermore, relative to the two previous fiscal years, USA Technologies' bad debt expenses increased by 95% from 2013 ($68,615) to 2014 ($134,176) and by *over 700%* from 2014 ($134,176) to 2015 ($1,099,528).  This significant increase in the Company's bad debt expense constituted a material trend, as illustrated in the following chart:



99.     USA Technologies' stock price fell sharply in response to the Company's announcements on September 29 and 30, 2015.  Shares of USA Technologies fell $0.28, or 10.1% to close at $2.49 on September 30, 2015.  The next day, shares of USA Technologies fell $0.11, or 4.4%, to close at $2.38 on October 1, 2015.

**F.     Relevant Post-Class Period Statements**

100.     On November 13, 2015, Defendants Herbert and Smith held an earnings conference call on behalf of the Company to discuss the Company's first quarter 2016 earnings reports, released that same day (the "Q1 2016 Earnings Call").

101.     During the Q1 2016 Earnings Call, Defendants Herbert and Smith elaborated on the Company's inadequate controls over financial reporting.  Specifically, Defendant Herbert stated the following, in pertinent part:

> Now, I would like to briefly comment on the 10-K filing delay and associated issues. As you know, we filed a Form 12b-25 on September 29 for an extension of the due date of the 10-K because we were still in the process of evaluating the material weakness in our internal control and preparing the required disclosure. The material weakness was identified late in the process of finalizing our 10-K. Prior to the filing of our Form 10-K on September 30, we addressed and remediated the significant deficiency related to the amount of bad debt reserve attributable to the uncollected customer accounts. In his comments, Duncan will further elaborate on this matter and I am satisfied with the steps taken so far relating to the allowance distributable to these uncollected customer accounts.

(Earnings Call Transcript, November 13, 2015.)

102.     Defendant Smith further elaborated, in pertinent part:

> Before turning to our outlook, I would like to comment on the internal control matters that we have disclosed in the 10-K that was filed on September 30, '15. With regards to the analysis support and documentation around the allowance for the uncollected customer accounts that are not collected through our normal procedures, that process has been addressed and re-mediated and was in effect as of September 30.

> Additionally, we are changing the balance sheet classification in these uncollected accounts commencing in September 30 financial statements. The uncollected customer accounts and the related allowance are no longer reflected in accounts

payable, where they have been reflected on consistent basis in all prior periods and are now reflected in accounts receivable. The new accounting classification is more appropriate now as the amounts have been outstanding for longer time periods and are larger in the aggregate that was anticipated in the accounting process was established many years ago.

Additionally, we are considering several additional business process improvement changes in order to reduce the number and amounts of these customer accounts that are not collected through our normal procedures. These process improvements may include direct invoicing, a process to charge the particular customer's checking account for the amount, and a process for early identification of connections that go into our negative balance position. We anticipate these process changes will be implemented in stages over the next 6 to 9 months.

Our work around other aspects of identified internal control deficiencies is ongoing and is expected to continue through the year and will be evaluated and tested as part of our fiscal year end process that will be documented in our 10-K for the fiscal year ended June 30, '16. Additionally, one of my primary focuses over the upcoming quarters will be to identify opportunities to improve, streamline and/or strengthen other processes and functions throughout the finance structure of the company, including a review of staff skill sets.

(Earnings Call Transcript, November 13, 2015.)

## G.    Defendants Acted with Scienter

103.    Collectively, the following factual allegations strongly support an inference of scienter on the part of Defendants. Further, Defendants' actions, intentions, and deliberately reckless conduct are imputed to the Company as a matter of law. Because of their key roles in the Company, Defendants Herbert, DeMedio, and Smith caused USA Technologies to act in the manner it did and perpetuate the material misrepresentations and omissions made throughout the Class Period. Defendants acted with the requisite intent to establish liability under the Exchange Act.

### *Violation of Publicly Stated Accounting Policies and GAAP*

104.    USA Technologies' principal executive and financial officers, including Defendants Herbert, DeMedio, and Smith, possessed overall responsibility for the Company's financial reporting and internal controls over financial reporting.

41

105.     USA Technologies' periodic reports filed with the SEC on Forms 10-K and 10-Q falsely stated that USA Technologies' financial statements conformed with publicly stated internal accounting policies and GAAP—which required that the Company report its uncollectable accounts as allowance deducted from the Company's asset group to which the allowance for uncollectable accounts related, *i.e.*, the Company's accounts receivable. (*See* ASC, Topic 210, Sub-topic 10, § 45, ¶ 13.)

106.     Defendants failed and/or refused to properly account for USA Technologies' bad debt estimate, allowance for uncollectable accounts, and accounts receivable. Instead, Defendants improperly "reflected" the Company's uncollectible accounts in its accounts financial statements reported to the SEC on Forms 10-K and 10-Q and in statements otherwise made to investors. The simplicity of Defendants' accounting error is highly suggestive of intentional and/or reckless conduct, which in turn gives rise to a strong inference of scienter.

107.     Furthermore, the size of Defendants' accounting error is further support of scienter on the part of Defendants.  USA Technologies initially reported bad debt expenses for the quarter and year ended dated September 30, 2015 of $47,184 and $649,528, respectively.  The correction of Defendants' accounting error resulted in these figures increasing to $479,184 and $1,099,528—adjustments of 900% and 70%, respectively.  Had Defendants' accounting errors been an innocent mistake, the restatement would not have impacted the Company's financial earnings so dramatically.

### *USA Technology Terminates DeMedio's Employment*

108.     From the beginning of the Class Period on November 14, 2014, until August 21, 2015, Defendant DeMedio served as the Company's CFO. On August 4, 2015, the Company filed a Form 8-K with the SEC, attaching a press release issued that same day (the "August 4, 2015

Press Release"). In the August 4, 2015 Press Release, the Company announced that DeMedio, would "transition[] to the newly created position of chief services officer ('CSO')" and appointment of Defendant Smith to serve as the Company's new CFO. (August 4, 2015 Press Release.) According August 4, 2015 Press Release, DeMedio had been "promoted to the role of chief financial officer in 2005, where he oversaw all aspects of the Company's financial planning, reporting and treasury functions[.]" (*Id.*)

109.    The August 4, 2015 Press Release further stated that as CSO, DeMedio would be "responsible for continuing to provide, and scale, the highest level of service to our customers, and their consumers, as well as delivering new and innovative services to these markets, with the goal of driving increasing value to both our customers and shareholders.  In addition, he will oversee the network and payment security on behalf of the Company's ePort Connect customers and consumers, including being responsible for USA Technologies' compliance with industry standards such as the Payment Card Industry (PCI)."

110.    In a Form 8-K filed with the SEC on October 20, 2015 (the "October 20, 2015 Form 8-K"), the Company disclosed that, effective as of October 14, 2015, Defendant DeMedio resigned for his position as the Company's CSO. The October 20, 2015 8-K does not disclose the reason behind DeMedio's resignation. (*See* October 2015 Form 8-K.) However, the details surrounding his resignation strongly suggest that USA Technologies' persuaded DeMedio to resign, or in more colloquial terms, "pushed him out" in response to the intentional and/or reckless conduct underlying the Company's restatement and material weaknesses in internal controls over financial reporting.

111.    The details surrounding DeMedio's resignation also strongly support the inference that he did not resign voluntarily, but was "pushed out":

(a)     DeMedio's resignation occurred approximately two months after he stepped down and Defendant Smith succeeded him as the Company's CFO, and two weeks following the Company's disclosure of "material weaknesses" in its internal controls over financial report.

(b)     Although DeMedio may still provide "consulting services" to USA Technologies following his resignation, DeMedio is limited to no more than 10 hours per week and sets an aggregate limit on the total number at 250 hours pursuant to a Separation Agreement with the Company.

(c)     Under the terms of the Separation Agreement, DeMedio has "relinquished any right to receive and . . . will not receive, base salary, annual or other bonus, any further Company stock or stock options, life insurance coverage, long-term disability coverage, supplemental disability coverage, automobile allowance, 401(k) plan contributions or paid vacation and holidays compensation. [DeMedio] shall not participate or receive any benefits under the Company's fiscal year 2016 short-term cash incentive plan, which was approved by the Board of Directors of the Company (the "Board") on July 24, 2015 and modified on July 29, 2015, or the fiscal year 2016 long-term stock incentive plan, which was approved by the Board on July 24, 2015."

112.    The resignation and/or termination of DeMedia from his position as CSO is indicative of the fact that certain individuals at the Company (*e.g.*, the Board of Directors) have decided that Defendants were aware of the deficiencies in their accounting policies and intentional and/or reckless conduct with respect to financial reporting, and that the deficiencies and/or reckless conduct was significant and severe enough to warrant at the very least the replacement of the

44

Company's then-serving CSO and former CFO. The October 20, 2015 Form 8-K's failure to disclose the true reason behind DeMedio's resignation occurring as it did so quickly after the Company disclosed the "material weaknesses" in its financial reporting strongly supports an inference of scienter.

<em>Remedial Actions</em>

113.    Following USA Technologies' disclosure of the financial reporting errors and breakdown in internal controls, the Company enacted several significant "remedial actions," with the potential of more remedial actions to come.

114.    As explained by Smith explained during the Company's Q1 2016 Earnings Call, the Company has, and is, changing the classifications for its uncollected accounts in its balance sheets as of September 30, 2016. Defendant Smith further stated that, "uncollected customer accounts and the related allowance are no longer reflected in accounts payable, where they have been reflected on consistent basis in all prior periods and are now reflected in accounts receivable. The new accounting classification is more appropriate now as the amounts have been outstanding for longer time periods and are larger in the aggregate that was anticipated in the accounting process was established many years ago." (Earnings Call Transcript, November 13, 2016.)

115.    In addition to new accounting policies for uncollected accounts, Smith explained that the Company is "considering several additional business process improvement changes in order to reduce the number and amounts of these customer accounts that are not collected through our normal procedures. These process improvements may include direct invoicing, a process to charge the particular customer's checking account for the amount, and a process for early identification of connections that go into our negative balance position. We anticipate these

process changes will be implemented in stages over the next 6 to 9 months." (Earnings Call Transcript, November 13, 2016.)

116.     The extent and breadth of these actions reveal the severity of the accounting errors and material weaknesses within the Company's financial reporting. Such action would not have been taken in the instance of mere negligence or even gross negligence. Given that USA Technologies responded proportionally to Defendants' intentional and/or reckless conduct, the Company's "remedial actions" strongly suggest an inference of scienter.

**H.     Loss Causation and Economic Loss**

117.     During the Class Period, as detailed herein, USA Technologies and the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of USA Technologies' securities and operated as a fraud or deceit on Class Period purchasers of USA Technologies securities by materially misleading the investing public. Later, when USA Technologies and defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of USA Technologies' securities materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of USA Technologies' securities during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

118.     On September 29, 2015, USA Technologies' stock price closed at $2.77. On September 30, 2015, USA Technologies' stock price closed at $2.49 per share on unusually heavy volume. On October 1, 2015, USA Technologies' stock price closed at $2.38 per share on heavy volume. Between September 29, 2015 and October 1, 2015, USA Technologies' stock price fell $0.39 per share, a drop of approximately 14%, and is attributable to the Company's disclosure of

its accounting problems in the Late Filing Notice, which the Company released on September 29, 2014.

## I.    Presumption of Reliance; Fraud-On-The-Market

119.    At all relevant times, the market for USA Technologies' common stock was an efficient market for the following reasons, among others:

(a)    USA Technologies' common stock met the requirements for listing and was listed and actively traded on the NASDAQ Stock Exchange, a highly efficient and automated market;

(b)    USA Technologies communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    USA Technologies was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about USA Technologies was reflected in and incorporated into the Company's stock price during the Class Period.

120.    As a result of the foregoing, the market for USA Technologies' common stock promptly digested current information regarding USA Technologies from all publicly available sources and reflected such information in USA Technologies' stock price. Under these circumstances, all purchasers of USA Technologies' common stock during the Class Period

suffered similar injury through their purchase of USA Technologies' common stock at artificially inflated prices, and a presumption of reliance applies.

121.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**J.      No Safe Harbor: Inapplicability of Bespeaks Caution Doctrine**

122.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

123.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

124.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of USA Technologies who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection,

or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## <u>LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS</u>

125.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired USA Technologies securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

126.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, USA Technologies securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by USA Technologies or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of November 2, 2015, there were 35,889,519 shares of USA Technologies common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

127.   Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

128.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

129.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)   whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of USA Technologies;

(c)   whether the Individual Defendants caused USA Technologies to issue false and misleading financial statements during the Class Period;

(d)   whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)   whether the prices of USA Technologies securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the

proper measure of damages.

130.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the

wrongs done to them. There will be no difficulty in the management of this action as a class action.

### COUNT I

**Against Defendants USA Technologies, Herbert, and DeMedio**
**for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder**

131.    Lead Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

132.    This Count is asserted against defendants and is based upon Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

133.    During the Class Period, defendants engaged in a plan, scheme, conspiracy and

course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the

other members of the Class; made various untrue statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; and employed devices, schemes and artifices to defraud in

connection with the purchase and sale of securities. Such scheme was intended to, and, throughout

the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class

members, as alleged herein; (ii) artificially inflate and maintain the market price of USA

Technologies securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase

or otherwise acquire USA Technologies securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

134.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for USA Technologies securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about USA Technologies' finances and business prospects.

135.    By virtue of their positions at USA Technologies, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

136.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or

directors of USA Technologies, the Individual Defendants had knowledge of the details of USA Technologies' internal affairs.

137.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of USA Technologies. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to USA Technologies' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of USA Technologies securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning USA Technologies' business and financial condition which were concealed by defendants, Lead Plaintiff and the other members of the Class purchased or otherwise acquired USA Technologies securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

138.    During the Class Period, USA Technologies securities were traded on an active and efficient market. Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of USA Technologies securities at prices artificially inflated by defendants' wrongful conduct. Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions

by Lead Plaintiff and the Class, the true value of USA Technologies securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price of USA Technologies securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

139.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

140.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Against the Individual Defendants
### for Violations of Section 20(a) of the Exchange Act

141.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

142.    During the Class Period, the Individual Defendants participated in the operation and management of USA Technologies, and conducted and participated, directly and indirectly, in the conduct of USA Technologies' business affairs. Because of their senior positions, they knew the adverse non-public information about USA Technologies' misstatement of income and expenses and false financial statements.

143.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to USA

Technologies' financial condition and results of operations, and to correct promptly any public statements issued by USA Technologies which had become materially false or misleading.

144.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which USA Technologies disseminated in the marketplace during the Class Period concerning USA Technologies' operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause USA Technologies to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of USA Technologies within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of USA Technologies securities.

145.    Each of the Individual Defendants, therefore, acted as a controlling person of USA Technologies. By reason of their senior management positions and/or being directors of USA Technologies, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, USA Technologies to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of USA Technologies and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

146.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by USA Technologies.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B.    Requiring defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Lead Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

Dated: January 18, 2016                                **THE ROSEN LAW FIRM, P.A.**

                                                       /s/ *Jacob A. Goldberg*
                                                       Jacob A. Goldberg (Pa Bar Id. 66399)
                                                       Gonen Haklay (Pa Bar Id. 764446)
                                                       101 Greenwood Avenue, Suite 203
                                                       Jankintown, PA 19046
                                                       Tel: (215) 600-2817
                                                       Fax: (215) 202-3827
                                                       Email: jgoldberg@rosenlegal.com

                                                       *Liaison Counsel for the Class*

                                                       **LEVI KORSINSKY LLP**
                                                       Nicholas I. Porritt
                                                       Adam M. Apton
                                                       1101 30th Street NW, Suite 115
                                                       Washington, DC 20007
                                                       Tel: (202) 524-4290
                                                       Fax: (202) 333-2121
                                                       Email: nporritt@zlk.com
                                                       Email: aapton@zlk.com
                                                       (*Pro hac vice to be submitted*)

                                                       *Attorneys for Ryan Fain and*
                                                       *Lead Counsel for the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 18, 2016 I served the foregoing *Amended Class Action Complaint for Violation of the Federal Securities Laws* by electronic means to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: <u>/s/ *Jacob A. Goldberg*</u>
Jacob A. Goldberg
275 Madison Avenue, 34th Floor
New York, NY  10016
E-M: jgoldberg@rosenlegal.com

*Liaison Counsel for the Class*

4822-9420-5484, v.  4