## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **STEVEN P. MESSNER, et al.** | **: CIVIL ACTION** |
| | : |
| **v.** | : |
| | **: NO. 15-5427** |
| **USA TECHNOLOGIES, INC., et al.** | : |

## MEMORANDUM

**KEARNEY, J.**                                                                                      **April 13, 2016**

A publicly traded company admitting an error in classifying bad debt expense could potentially be liable for breaching fiduciary duties, violating the securities law or both.    For securities fraud, the shareholder must plead particularized facts supporting a strong inference of *scienter* leading us to infer the company or its officers had a fraudulent intent.   This inference drawn from the plead facts must be cogent or at least as compelling as inferences drawn from the company's non-culpable explanation for correcting its earlier classification of bad debt expense. Our role under the Private Litigation Securities Reform Act is to compare the two explanations and determine whether the shareholder's facts create an inference as least as compelling as the company's explanation.   When we find the shareholder has not plead red flags or circumstantial evidence of fraudulent intent arising from a company correcting its accounts payable treatment of bad debt expense so as to classify the bad debt as an accounts receivable, and absent any other particularized facts required for securities fraud, we cannot find the required *scienter*.   Even assuming the announced misclassification of the accounts payable is material, absent these particularized facts, we dismiss his Amended Complaint in the accompanying Order.

## I.     Allegations in Amended Complaint.

Plaintiff alleges Defendant USA Technologies, Inc. ("USA Technologies" or the "Company") and its top executives Stephen P. Herbert, David M. DeMedio, and James Duncan Smith (the "Individual Defendants") violated §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934, as well as Rule 10b-5, by making materially false and misleading statements regarding the Company's: 1) accounting practices and procedures concerning bad debt expenses and, 2) the adequacy and efficacy of internal controls over financial reporting, business, operation, and compliance policies.[1]

The Company provides wireless networking, cashless transactions, asset monitoring and other services to companies implementing self-service or unattended ticket markets—i.e, vending machines, amusement parks, arcades, car washes, and kiosks to facilitate cashless payments.[2] The Company's main source of revenue is license and transaction fees resulting from connections to, as well as services provided by, its ePort Connect service.[3] There are two financing options for ePort customers: the Quickstart Program and the Jumpstart Program.[4] The Quickstart Program provides customers with a five-year non-cancelable lease for the devices with a purchase option at the end of the lease term.[5] Quickstart customers accounted for 89% of gross connections in fiscal year 2015.[6] The Jumpstart Program requires no upfront cost but customers pay a higher monthly service fee, and a one-time activation fee.[7] The Company continues to own the ePort device during the life of the contract.[8] The Jumpstart Program accounted for 65% of gross connections in fiscal year 2014 but only 11% in fiscal year 2015.[9] In fiscal year 2015, there were approximately 333,000 connections to the ePort Connect services and the company processed approximately 217 million cashless transactions totaling approximately $389 million.[10]

A. **November 14, 2014 Quarterly Report, Press Release and Earnings Call**

Defendants Herbert and DeMedio signed and filed the Company's Form 10-Q with the Securities and Exchange Commission ("SEC") on November 14, 2014, reporting financial information for the first quarter of fiscal year 2015:

> i) accounts receivable for the quarter in the amount $2,444,748, less an allowance for uncollectible accounts of $129,000; ii) accounts payable for the courter [sic] in the quarter of $7,632,643; iii) 'bad debt expense' for the quarter in the amount of $158,716; and iv) a net loss for the quarter in the amount of $60,956, with a net loss per common share of $0.01.[11]

Compared to the first quarter of fiscal year 2014, the Company reported a $132,000 increase in bad debt expense.[12] Defendants Herbert and DeMedio certified the effectiveness of the Company's internal controls over financial reporting and no changes in those controls.[13] They further certified the report does "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading [.]"[14] The Company's press release issued on the same day discloses the first quarter earnings results, which includes the same information reported in the 10-Q.

DeMedio then discussed the first quarter results in a November 14, 2014 earnings call: "[s]elling, general, and administrative expenses were $3.6 million in the first quarters compared to 3.3 million in the year ago quarter [.]" The increase was due to non-cash expenses predominantly related to an "increase in the reserve for doubtful accounts and equity related compensation."[15]

B. **February 17, 2015 Quarterly Report, Press Release, and Earnings Call**

Defendants Herbert and DeMedio signed and filed the Company's Form 10-Q on February 17, 2015, reporting financial information for the second quarter of fiscal year 2015:

i) accounts receivable for the quarter in the amount of $2,758,475, less an allowance for uncollectible amounts of $197,000; ii) accounts payable for the courter [sic] in the quarter of $5,385,822; iii) 'bad debt expense' in the quarter in the amount of $140,996; and iv) a net loss for the quarter in the amount of $260,915, with a net loss per common share of $0.01.[16]

Compared to the second quarter of fiscal year 2014, the Company reported an $89,000 increase in its bad debt estimates.[17] Compared to the first two quarters of fiscal year 2014, it reported a $205,000 increase in bad debt expense for the first two quarters of fiscal year 2015.[18] Defendants Herbert and DeMedio certified the effectiveness of the Company's internal controls over financial reporting and there had been no change in those controls.[19] They further certified the report does "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading [.]"   The Company's same-day press release discloses the first quarter earnings results including the same information reported in the 10-Q.  During the February 17, 2015 earnings call, DeMedio represented "[s]elling, general, and administrative expenses were $3.5 million in the second quarter compared to $3.2 million in the year-ago quarter [.]"[20] Approximately half of this 10.5% increase was due to an increase in "equity related compensation and the reserve for doubtful accounts."[21]

### C.   May 15, 2015 Quarterly Report, May 11, 2015 Press Release, and Earnings Call

Defendants Herbert and DeMedio signed and filed the Company's Form 10-Q on May 15, 2015, reporting financial information for the third quarter of fiscal year 2015:

i) accounts receivable for the quarter in the amount of $3,403,489 less an allowance for uncollectible accounts of $493,000; ii) accounts payable for the courter [sic] in the quarter of $5,208,646; iii) 'bad debt expense' in the quarter in the amount of $302,632; and iv) a net loss for the quarter in the amount of $566,610, with a net loss per common share of $0.03.[22]

Compared to the third quarter of fiscal year 2014, the Company reported a $314,000 increase in bad debt estimates.[23] Compared to the first three quarters of fiscal year 2014, it

4

reported an increase of $536,000 in bad debt estimates for the first three quarters of fiscal year 2015.[24] Defendants Herbert and DeMedio certified the effectiveness of the Company's disclosure controls and procedures, as well as internal controls over financial reporting and no change in those controls.[25] They further certified the report does "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading [.]"[26]

The Company's May 11, 2015 press release discloses the third quarter earnings results, which included the same information included in the subsequently filed 10-Q.[27] During the same-day earnings call, DeMedio represented "[s]elling, general, and administrative expenses were $4.3 million in the third quarter, compared to $3.5 million in the year ago quarter [.]"  The increase was in part due to a $300,000 increase in "the reserve for doubtful accounts."[28]

**D.      September 10, 2015 Earnings Release**

The Company's September 10, 2015 press release disclosed financial earnings results for the fourth quarter and year end June 30, 2015.[29] For the fourth quarter of the fiscal year 2015, it reported a bad debt expense of $47,184, along with net income of $68,999, and a net loss per common share of $0.01.[30] For the fiscal year 2015 year end, it reported a bad debt expense of $649,528, along with a net loss of $819,482, and a net loss per common share of $0.04.[31]

**E.      The September 29, 2015 Late Filing Notice and the September 30, 2015 Restatement.**

After the market closed on September 29, 2014, the Company filed a Late Filing Notice announcing its inability to file a Form 10-K reporting the year-end financial disclosures.[32] The Late Filing Notice declared "management identified deficiencies in both the design and operating effectiveness of the Company's internal control over financial reporting, which when aggregated represent a material weakness in internal control."[33] Specifically, procedures related to accounts

5

receivable "did not identify a large number of small balance accounts that may be uncollectible and were not appropriately dispositioned, collected, remediated, reserved for and/or written-off."[34] As a result, the Company changed its June 30, 2015 financial results to include a $450,000 increase in "bad debt reserve."[35]

On September 30, 2015, the Company filed its Form 10-K restating its financial results for the 2015 fourth quarter and fiscal year end.[36] The Company admitted details surrounding the "material weakness" management uncovered within its internal controls over financial reporting.[37] The Company reported a bad debt expense of $479,184, compared to $47,184 before the restatement.[38] The Company reported a bad debt expense for fiscal year 2015 of $1,099,528, as compared to a bad debt expense of $649,528 before the restatement.[39]  After the correction, the Company's stock price fell $0.28, or 10.1%.[40]

On November 13, 2015, Defendants Herbert and Smith held an earnings call to discuss both the fiscal year 2016 first quarter and the flawed procedures which led to the September 30, 2015 restatement.[41] Herbert represented the Company had "addressed and remediated the significant deficiency related to the amount of bad debt reserve attributable to the uncollected customer accounts."[42] Smith further represented the Company would change "the balance sheet classification in these uncollected accounts commencing in September 30 financial statements. The uncollected customer accounts and the related allowance are no longer reflected in accounts payable, where they have been reflected on a consistent basis in all prior periods and are now reflected in accounts receivable."[43]

### F.   Plaintiff elects to sue for securities fraud.

Shortly thereafter, Plaintiff[44] on behalf of a class sued the Company arguing its statements regarding the 'bad debt expense' are "false and/or materially misleading because they

omitted that the Company was not accounting properly for its bad debt expenses."[45] Plaintiff alleges the Company was "in the midst of an ongoing trend involving the Company's bad debt expenses" when it filed each 10-Q.[46] Plaintiff alleges the Company and its senior officers knew of the bad debt expense's steady and material increase, but "omitted to disclose to investors that (i) a trend within the Company's bad debt expense existed and (ii) the trend was expected to have a materially unfavorable impact on the Company's net income and/or earnings."[47] Plaintiff argues Item 303 of Regulation S-K, 17 C.F.R. 229.303 ("Item 303") compels disclosure of this information.

Plaintiff filed an Amended Complaint with several detailed allegations evidencing materiality essentially based on his claim "uncollected customer accounts had been included in the Company's 'accounts payable,' which was subsequently corrected by including them in the Company's 'accounts receivable'."[48] We now address whether the Plaintiff's second attempt at pleading a securities fraud claim based on this September 29, 2015  admitted correction can withstand the Company's motion to dismiss under the Private Securities Litigation Reform Act of 1995 ("PSLRA").[49]

## II.    Analysis

Defendants argue Plaintiff fails to plead a strong inference of *scienter* and a false or misleading statement of material fact other than the September 10, 2015 Press Release. Defendants' principal argument is Plaintiff does not and cannot show a "strong inference" of *scienter*.  They argue Plaintiff fails to show *scienter* in concealing the bad debt expense as an account payable through allegations of "motive or opportunity."  Further, they argue Plaintiff's attempt to plead *scienter* through "strong circumstantial evidence" shows nothing more than the

Company made a mistake in its financial reporting rather than a "cogent" or "compelling" inference of *scienter*.

### A. Plaintiff fails to plead a strong inference of *scienter*.

To impose securities fraud liability under § 10(b) and Rule 10b-5, a plaintiff "must prove defendant acted with *scienter*, 'a mental state embracing intent to deceive, manipulate, or defraud.'"[50] The PSLRA placed an even greater pleading standard on securities plaintiffs requiring him to plead particular facts "giving rise to a strong inference" of *scienter*.[51] Without guidance from Congress defining a "strong inference", the United States Supreme Court set out to "prescribe a workable construction of the strong inference standard, a reading geared to the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims."[52]

In deciding whether allegations support a "strong inference" of *scienter*, we must evaluate the complaint as a whole, without isolating an individual allegation.[53] We must also account for "plausible opposing inferences."[54] Our inquiry becomes comparative: "How likely is it that one conclusion, as compared to others, follows from the underlying facts?"[55] The inference of *scienter* need not be the most plausible, but it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[56]

Plaintiff alleges three facts which he contends present a "strong inference" of *scienter*:[57]

- The simplicity and size of violating publicly stated accounting policies and GAAP is suggestive of a strong inference of *scienter*.[58] As executive officers, the Individual Defendants falsely certified the Company's financial statements conformed to publicly stated internal accounting policies and GAAP, which require the Company report its allowance for

uncollectible accounts deducted from accounts receivable.[59] The Company allegedly reflected uncollectible accounts in accounts payable instead.[60]

- DeMedio's resignation "strongly suggests" intentional or reckless conduct with regard to the Company's restatement and material weaknesses in internal controls over financial reporting.[61]

- The Company's "several significant remedial actions" strongly suggest an inference of *scienter*.[62]

Defendants argue these allegations fail to present a cogent or compelling inference of *scienter*. Rather, at most, these allegations portray an accounting error, which the Company promptly identified and resolved.[63] Defendants argue the Amended Complaint fails to provide critical details necessary for a finding of *scienter*: "who knew about any weaknesses in the Company's internal controls, when anyone in management learned of the weakness, or how they learned of the weakness or any impact it would have on the Company's accounting or financial statements." [64] Without this information, the Amended Complaint is left alleging only a violation of GAAP, which itself is insufficient to show *scienter*.

" 'The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.' "[65]

Plaintiffs do not allege motive or opportunity on the part of the Individual Defendants. Instead, Plaintiffs attempt to plead facts evidencing a circumstantial showing of recklessness and conscious misbehavior. Conscious misbehavior involves "intentional fraud or other deliberate illegal behavior."[66] In the securities context, recklessness includes "highly unreasonable [conduct], involving not merely simple, even inexcusable negligence, but an extreme departure

9

from the standard of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."[67] In lock step with the heightened pleading standards, *scienter* cannot "rest on a bare inference that a defendant 'must have had' knowledge of the facts."[68] Rather, the circumstantial evidence must be particular and detail the "who, what, when, where and how" of the events giving rise to the claim.[69]

    As described below, Plaintiff's allegations amount to little more than "fraud by hindsight." [70] Evaluating the allegations of *scienter* as a whole, they are insufficient to survive the motion to dismiss.

### 1.    GAAP violations.

    Plaintiff alleges the Company's failure to adhere to GAAP in accounting for uncollectible accounts, particularly in this dollar amount in excess of $400,000 is evidence of *scienter*.[71] "The Supreme Court has acknowledged that GAAP are 'far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions."[72] Instead, "GAAP tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management."[73] For this reason, an alleged GAAP violation standing alone is incapable of providing a strong inference of *scienter*.[74] But a plaintiff may allege facts showing "defendants had clear reasons to doubt the validity of the issuer's financials but, nonetheless, kept turning a blind eye to all such factual red flags."[75] Accordingly, there must be more than simply a GAAP violation to show strong inference of *scienter*.[76]

    Plaintiff does not plead facts sufficient to sustain his fraud theory.  Initially, Plaintiff's *scienter* allegations are general in nature.  Plaintiff alleges "[b]ecause of their key roles in the Company, Defendants Herbert, DeMedio, and Smith caused USA Technologies to act in the

manner it did [.]"[77] Plaintiff further alleges Defendants "possessed overall responsibility for the Company's financial reporting and internal controls over financial reporting."[78] These allegations provide no particularity as to how or why Defendants would have been aware of an inaccurate bad debt expense figure or GAAP violation.[79]

Plaintiff's broad and general pleading leads to doubts as to how the alleged GAAP violation contributed to the misstatement of the bad debt expense. Plaintiff seemingly jumps from a true premise (Company changed its "balance sheet classification" for various small-balance uncollected accounts) to an uncertain conclusion (the Company was improperly accounting for these small-balanced accounts with *scienter*). Even assuming improper classification of the allowance for uncollectible accounts, we are left with no facts evidencing "red flags" surrounding the allowance for uncollectible accounts to which Defendants were turning a "blind eye."[80] Plaintiff has not alleged facts tending to show the alleged improper accounting classifications previously caused any financial misstatements. As plead, Defendant Smith represented uncollected customer accounts and the related allowances were reflected in accounts payable "on [a] consistent basis in all prior periods" ostensibly without any reporting problems concerning the bad debt expense.[81] Plaintiff does not allege the Company restated any financials previously reported using these alleged improper accounting technique other than the Company restating its 2015 fourth quarter and fiscal year bad debt expense in the September 30, 2015 Form 10-K. This absence of facts makes Plaintiff's allegations of *scienter* concerning misstatements before September 2015 all the less cogent or compelling. As evident from the SEC filings, the Company properly deducted the allowance for uncollectible accounts from accounts receivable. The problem arose with respect to the identification of small-balance accounts which should have been written off or included in the allowance for uncollectible

11

accounts.  Whether the inability to identify these small-balance accounts constitutes a GAAP violation or merely negligence is maybe a more nuanced question than we need decide today. [82] Without any improper reporting in those previous filings, press releases, and earnings calls, Plaintiff is left with only an alleged GAAP violation.  A GAAP violation alone is insufficient.[83]

Plaintiff attempts to prove the "more" required to be coupled with a GAAP violation by pointing to the "simplicity" and "size" of the accounting error.[84] Plaintiffs argue "Defendants failed to recognize an untold number of accounts uncollectible, a violation of GAAP, that smacks of fraudulent intent given the simplicity underlying the relevant account rules."[85] Plaintiff's allegations mount to little more than corporate mismanagement without proximity to the requisite "extreme departure" from ordinary standards of care.[86]

The cases on which Plaintiff primarily relies are factually distinct.[87] In *Ravisent*, the defendant company's initial public offering ("IPO") registration statement disclosed a transition from "selling hardware-based digital solutions to licensing software-based digital solutions."[88] There is a specific guideline for software revenue recognition ("SOP 97-2"), which provided revenue should not be recognized until the software is delivered.[89] The registration statement discussed the company's revenue recognition policies, which were consistent with the guidelines, and warnings concerning how the transition in strategic focus could affect revenues.[90] Post-IPO, the company reported second and third quarter earnings results but subsequently restated these financial statements due to revenue recognition issues surrounding various contracts signed by the company.[91] The complaint alleged the executive defendants both participated in drafting the investor prospectus, which specifically referenced the SOP 97-2, knew the terms of the new software contracts, and knew the company was recognizing revenue in violation of its own accounting practices and SOP 97-2.[92] Given these specific allegations the

court determined the complaint specifically alleged *scienter*. [93] Here, the red flags in *Ravisent* are nowhere to be found.   While the Company's revenue source changed from the JumpStart program to the QuickStart program, there is no change in "strategic focus" requiring different accounting principles of which management would have been aware. While the Company's QuickStart Program has become the preferred customer option, Plaintiff does not plead or argue and we cannot conceive of a reason why such a shift would alert Defendants to improper accounting techniques or "red flag" the inaccuracy of the bad debt expense reported in the September 10, 2015 Press Release.   At oral argument, Plaintiff's counsel repeatedly relied on this shift in consumer preference as factual support for his allegations the Individual Defendants should have known of the accounting error. Yet, as Defendants correctly countered, Plaintiff has not shown how the shift from JumpStart to QuickStart would have focused Defendants on these small-balance accounts.   Further, in *Ravisent*, the defendants' improper revenue recognition grossly inflated their financial statement as the Company had a limited amount of customers.[94] Here, the company has 330,000 connections to its ePort technology.   It added 2,300 customers to its ePort services, who accounted for 67,000 additional connections in fiscal year 2015.[95] The Company has over 9,000 customers utilizing its services. [96] While Plaintiff's math is correct, and the restated bad debt expense was a 900% increase in the quarterly amount, and a 70% increase in the fiscal year-end amount, the size of the bad debt expense increase is less than 4% and 2% of quarterly and year-end revenue amounts, respectively.   Plaintiff's assertion at oral argument that the investing public and shareholders care about the bottom line (i.e. net income) the damage to net income here of $270,000 is not comparable to the "gross[] overstatement" of revenue in *Ravisent*. [97]

In *Bradley*, plaintiffs alleged the company entered into a "sham" sale of Deconamine, a cold remedy, to artificially boost its revenues and stock price.[98] Plaintiffs alleged the defendants "designed [the sham sale] solely to boost Third Quarter financials without any expectation that the customer would actually keep the product."[99]  After announcing an SEC investigation, the company restated its financials to remove the transaction from revenue as it "did not meet the criteria for revenue recognition in [the relevant quarter]."[100] The auditors concluded it did not meet the criteria because the customer expressed its intention to return the product.[101] In a brief *scienter* analysis, the court determined the defendants had access to "specific information suggesting their public statements" were not accurate.[102] Further, the product in the "sham" sale was a "dormant product with limited sales" such that the revenue generated should have alerted executives as it represented 20% of the quarterly revenue.[103] Again, this factual scenario is entirely dissimilar from what Plaintiff presents here in the Amended Complaint.  Unlike in *Bradley*, where the "sham" sale of a dormant product accounted for 20% of the quarterly earnings, nothing about the "small balance uncollectible accounts" would have presented a red flag to Defendants which they should have investigated further before reporting.

In *Freedman*, the company "regularly touted as one of its key competitive advantages its favorable effective tax rate [.]"[104]  In 2011, the company announced it would file its 10-K late after it identified "a material weakness in internal control over financial reporting for income taxes." [105] The company's prior statements had understated its tax expense by about $500 million.[106] In 2012, the company announced it would have to restate its tax expense again to the tune of $250 million because it had not adequately remediated the material weakness.[107] Then, later in 2012, the company issued a third restatement regarding its tax expense.[108] Given that after the first two restatements the company placed a "high-level focus" on the relevant issues

and continued to release inaccurate financial statements, the court found the level of recklessness required to infer *scienter*.[109] This case presents a far different factual scenario from *Friedman*. Here, we have no previous restatements which would have served to turn Defendants' "high-level focus" towards either the bad debt expense or the classification of various small-balance accounts.

Plaintiff's cites to these authorities do not inform a finding he adequately plead *scienter*.[110] Plaintiff does not plead a "cogent" or "compelling" inference of *scienter*. Plaintiff's allegations amount to little more than possible negligence and corporate mismanagement as opposed to an extreme departure from ordinary standards of care. There are insufficient allegations to show Defendants knew or should have known of its improper accounting techniques. Plaintiff did not allege there were red flags which Defendants chose to ignore. And while Plaintiff avers a possible GAAP violation, the size of the violation, when compared to the complete financial picture of the Company rather than a single balance sheet line item, represents a relatively small expense.

The simplicity of the alleged GAAP violation provides Plaintiff with his best argument. The principle of uncollected accounts as a contra-asset to accounts receivable is simple enough. But it seems implausible for Defendants to have fraudulently hid these "small balance accounts" in another line item with the requisite state of mind for three weeks, for no plead or obvious benefit, and then, unprovoked by government investigation and no pleading of personal gain, announce it made a mistake in reporting its financials. There is no allegation of gain in the three weeks between the announcement and the corrected accounting for bad debt expense. This is not a complaint pleading insiders gained by misrepresenting the bad debt expense. We recognize the statement, regardless of personal gain, may give rise to liability. But we need more than "should

have known" of a relatively minor accounting classification error.    Rather, the competing inference is more plausible: the financial persons responsible for accounting for these "small-balance accounts", accounts which corporate executives most likely do not have particular knowledge of, mistakenly misclassified these "bad debts".    When the Company realized the problem, it admitted its error, corrected its financial statements, and remediated the problem.

### 2.  DeMedio's and Smith's resignations.

Plaintiff also argues the resignations of DeMedio and Smith are strong circumstantial evidence of *scienter*.[111] DeMedio served as the Company's CFO since April 2005. On July 30, 2015, the Company filed a Form 8-K detailing a board-approved salary increase of 14% for DeMedio, effective July 24, 2015.[112]

Five days later, on August 4, 2015, the Company filed a Form 8-K representing: 1) it promoted DeMedio to the newly created executive position of Chief Services Officer ("CSO") for which he kept his recently raised salary and 2)  hired Smith as the new CFO, effective August 31, 2015.[113]   Effective October 14, 2015, DeMedio resigned from his CSO position, two (2) weeks after the Company restated its financials.  The Company retained him as a consultant.

Smith resigned as CFO effective January 22, 2016, four (4) months after the Company restated its financials. Admittedly, Smith's resignation took place after the filing of the Amended Complaint and of course, is not alleged there.  However, we will consider the resignation as we may take notice of the January 22, 2016 Separation Agreement publicly filed by the Company and attached to Plaintiff's Opposition.[114]

The resignation of an officer may serve as evidence of *scienter* where the timing is suspicious and it is coupled with "extraordinary corporate measures."[115] In other words, "there must be some reason to believe the resignation was actually connected with the alleged fraud."[116]

16

Such an "extraordinary corporate measure" could be banishment from corporate premises, denial of severance, or statement tying the resigning officer to the fraud.[117]

Plaintiff fails to plead sufficient facts to show the resignations could constitute a "piece of the *scienter* puzzle." *Id.* First, two months prior to the Company's restatement, DeMedio received a 14% raise and a new executive position created solely for him to oversee the ePort connection services, for which he kept his previously increased salary. Plaintiff, quoting DeMedio's Separation Agreement, argues when DeMedio ultimately resigned, he essentially forfeited all rights to any compensation:

> Under the terms of the Separation Agreement, DeMedio has 'relinquished any right to receive and . . . will not receive, base salary, annual or other bonus, any further Company stock or stock options, life insurance coverage, long-term disability coverage, supplemental disability coverage, automobile allowance, 401(k) plan contributions or paid vacation and holidays compensation. [DeMedio] shall not participate or receive any benefits under the Company's fiscal year 2016 short-term cash incentive plan, which was approved by the Board of Directors of the Company (the "Board") on July 24, 2015 and modified on July 29, 2015, or the fiscal year 2016 long-term stock incentive plan, which was approved by the Board on July 24, 2015.'[118]

Upon review, Plaintiff failed to comprehensively quote the Separation Agreement. In the very next sentence, the Agreement reads "[t]he only payments, benefits, stock and stock options you shall receive are those set forth in paragraphs 2, 3, 4, and 6 hereof [.]"[119] Paragraph 2 of the Separation Agreement provides DeMedio with: 1) $270,000 payable in twenty-six equal payments; and 2) $67,500 in quarterly payments.[120] Paragraph 3 provides the Company vested and provided DeMedio with 36,097 shares of common stock and 60,000 non-qualified stock options.[121] Paragraph 4 provides the Company would pay DeMedio an amount equal to 120 hours of paid time off.[122] Finally, Paragraph 6 states the Company will provide DeMedio and his dependents medical coverage for one year.[123] Contrary to Plaintiff's argument, DeMedio

received a severance package upon his resignation. Further, the Company retained DeMedio as a consultant. If the Company "pushed out" DeMedio for fraudulent conduct, we would fairly presume it should fire him, without severance and not retain him as a consultant.[124] DeMedio's resignation cannot serve as part of the "*scienter* puzzle."

We reach the same result on Smith's resignation. Smith took over as CFO on September 1, 2015 (nine (9) days prior to the September 10, 2015 Press Release) and resigned January 22, 2016, approximately four (4) months after the restatement. Plaintiff argues Smith received "virtually no severance package and was forced to forfeit all benefits".[125] The timing of Smith's resignation is not suspicious as it comes four (4) months after the restatement. After only being the CFO for four and one half (4½) months, Smith received a full month's pay in severance, one month's healthcare for him and his daughter, an amount equivalent to his paid time off, and five-thousand dollars ($5,000) toward his legal fees in negotiating his separation.[126] Finally, Smith's Separation Agreement represents the "resignation was not due to any disagreement with the Company, its management or Directors on any matter relating to the operations, policies or practices of the Company." [127] Given these facts and the lack of any contrary facts plead under Rule 11, we cannot find Smith's resignation is evidence, weak or strong, of an inference of *scienter*.

DeMedio's and Smith's resignations, even when considered in conjunction with the alleged GAAP violations, are not significant circumstantial evidence to create a "strong inference" of *scienter*.

### 3. Remedial Actions

Plaintiff alleges the Company's "significant remedial actions" after recognizing its error indicate a fraudulent intent.[128] Plaintiff alleges the new accounting policy for uncollected

accounts and the "process improvement changes" being considered by the Company evidence the severity of the accounting errors and material weaknesses and such actions would be unnecessary in the instance of negligence, gross or otherwise.[129]

Defendants argue these allegations do not show an inference of *scienter* and Plaintiff does not offer a counterargument as to why these actions could evidence recklessness. We fail to see the relevance of these remedial actions. They tend to cut against Plaintiff as they support a non-culpable inference by showing Defendants' recognition of the error and attempt to improve its business to reduce the likelihood of another reporting error. If Defendants had not initiated these actions or had tried and repeatedly failed to correct the error, it may be a different story and would be more comparable to *Freedman*.[130]

### B. Section 20(a) Liability

Section 20(a) of the Securities and Exchange Act imposes liability on persons who control a violator of § 10(b).[131] A "controlled person" must be liable for a Section 20(a) claim to exist.[132] Here, because we find Plaintiff fails to state  § 10(b) claims against a Defendant, we cannot find § 20(a) liability and we dismiss this claim.

### C.   Another amendment will not meet the standard for pleading *scienter*.

Plaintiff asks to again amend his Amended Complaint to plead *scienter*. At oral argument, his counsel suggested he could plead facts relating to an increasing but concealed trend of bad debt expense during a change in the Company's revenue base. We think he may have already plead these facts. Plaintiff did not suggest there were additional public records which could inform a finding of *scienter*. Even if he did, Plaintiff has not correlated how a change in the revenue base would motivate Defendants to mistakenly characterize uncollected customer accounts as accounts payable, or should have alerted Defendants to any mistake in the

accounting process. Plaintiff has not provided a reason to allow another amendment to his allegations as, unlike materiality, he has already plead all facts regarding the bad debt expense trends in light of the changing revenue base. We find, even giving him the benefit of our deference at this stage, he cannot plead *scienter* under the PLRSA.

### III.   CONCLUSION

Plaintiff pleads facts more plausibly confirming a mistake in the accounting treatment of a bad debt expense by including "uncollected customer accounts" in the Company's accounts payable and then corrected by including them in accounts receivable. His facts leading to his fraud conclusion are more likely to confirm negligence. His speculative leap of "they must have known" would allow any shareholder plaintiff to draw a nexus between increasing revenues and a secret plan to conceal an accounting error. We could not draw a strong inference of fraudulent intent from a change in revenue base. The inference is not as compelling as the competing, non-culpable inference of a mistake, possibly accountant or auditor negligence, in classifying uncollected customer accounts. Absent pleading of red flags or similar facts tending to show circumstantial evidence beyond speculation, Plaintiff fails to state a claim for securities fraud. We grant Defendant's motion to dismiss in the accompanying Order.

---

[1] Count I of the Amended Complaint does not list Smith as a defendant but repeatedly refers to the "Individual Defendants".

[2] (ECF Doc. No. 19, at ¶ 2.)

[3] (*Id.* at ¶ 22.)

[4] (*Id.* at ¶ 23.)

[5] (*Id.* at ¶ 24.)

[6] (*Id.* at ¶ 26.)

[7] (*Id.* at ¶ 25.)

[8] (*Id.*)

[9] (*Id.* at ¶ 26.)

[10] (*Id.* at ¶ 22.)

[11] (*Id.* at ¶¶ 45-46.)

[12] (*Id.* at ¶ 47.)

[13] (*Id.* at ¶ 49.)

[14] (*Id.* at ¶ 50.)

[15] (*Id.* at ¶ 57.)

[16] (*Id.* at ¶¶ 60-61.)

[17] (*Id.* at ¶ 62.)

[18] (*Id.* at ¶ 63.)

[19] (*Id.* at ¶ 64.)

[20] (*Id.* at ¶ 72.)

[21] (*Id.*)

[22] (*Id.* at ¶¶ 81-82.)

[23] (*Id.* at ¶ 83.)

[24] (*Id.* at ¶ 84.)

[25] (*Id.* at ¶ 86.)

[26] (*Id.* at ¶ 87.)

[27] (*Id.* at ¶¶ 74-75.)

[28] (*Id.* at ¶ 78.)

[29] (*Id.* at ¶ 90.)

[30] (*Id.* at ¶ 91.)

[31] (*Id.*)

[32] (*Id.* at ¶ 94.)

[33] (*Id.*)

[34] (*Id.*)

[35] (*Id.*)

[36] (*Id.* at ¶ 95.)

[37] (*Id.* at ¶ 96.)

[38] (*Id.* at ¶¶ 91-92.)

[39] (*Id.* at ¶ 97.)

[40] (*Id.* at ¶ 99.)

[41] (*Id.* at ¶ 100-01.)

[42] (*Id.* at ¶ 101.)

[43] (*Id.* at ¶ 102.)

[44] On October 1, 2015, one day after the Company restated its financials, Steven Messner filed the original class complaint.  The class plaintiffs then agreed Fain qualified as 'Lead Plaintiff' under the PSLRA.  Fain subsequently filed the operative Amended Class Complaint.

[45] (*Id.* at ¶¶ 51, 55, 59, 66, 70, 73, 76, 80, 88 & 92.)

[46] (*Id.* at ¶¶ 52, 67 & 89.)

[47] (*Id.*)

[48] (*E.g., Id.* at ¶ 51.)

[49] Plaintiff must satisfy the congressionally imposed pleading requirements for claims under § 10(b) and Rule 10b-5. To state a claim under § 10(b) and Rule 10b-5, a plaintiff must plead (1) a material misrepresentation or omission; (2) *scienter*; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation, or a causal connection between the material misrepresentation or omission and the loss. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42; *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006). The PSLRA complaint "shall specify each statement alleged to have been misleading" and "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Additionally, "the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A). Here, the required state of mind, or *scienter*, is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted). Because § 10(b) claims sound in fraud, a plaintiff must also satisfy the heightened pleading standard of Federal Rules of Civil Procedure 9(b). Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). In a securities action, Rule 9(b) requires "(1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." *In re Rockefeller Ctr. Prop. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002).

[50] *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 & n.12 (1976)).

[51] 15 U.S.C. § 78u-4(b)(2)(A).

[52] *Tellabs*, 551 U.S. at 322.

[53] *Id.* at 323.

[54] *Id.*

[55] *Id.*

[56] *Id.* at 324.

[57] (ECF Doc. No. 19, at ¶¶ 103-16)

[58] (*Id.* at ¶¶ 106-07.)

[59] (*Id.* at ¶ 105.)

[60] (*Id.* at ¶ 106.)

[61] (*Id.* at ¶¶ 108-12.)   Plaintiff also argues Smith's resignation is circumstantial evidence of *scienter*.   While Smith resigned after the Amended Complaint was filed, we will address his resignation below.

[62] (*Id.* at ¶¶ 113-16.)

[63] (ECF Doc. No. 20-1, at 10-11)

[64] (*Id.* at 12.)

[65] *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997) (citation omitted)).

[66] *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999).

[67] *In re Suprema*, 438 F.3d at 276 (quoting *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 192 (3d Cir. 2000) (quotation omitted)).

[68] *In re Advanta*, 180 F.3d at 539.

[69] *In re Burlington*, 114 F.3d at 1422 (citation omitted); *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 616 (E.D. Pa. 2009) (citation omitted).

[70] *Winer Family Trust v. Queen*, 503 F.3d 319, 332 (3d Cir. 2007).

[71] (ECF Doc. No. 19, at ¶ 105.)

[72] *In re Radian*, 612 F. Supp. 2d at 614 (quoting *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 544 (1979).

[73] *Id.* (citation omitted).

[74] *See In re Radian*, 612 F. Supp. 2d at 620; *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 286 (D.N.J. 2007) (collecting cases).

[75] *In re Intelligroup*, 527 F. Supp. 2d at 286-87.

[76] We find the same standard applies to certifications of compliance with the Sarbanes-Oxley Act ("SOX").   *In re Radian*, 612 F. Supp. 2d at 620; *In re Intelligroup*, 527 F. Supp. 2d at 342.

[77] (ECF Doc. No. 19, at ¶ 103)

[78] (*Id.* at ¶ 104.)

[79] *See In re Advanta*, 180 F.3d at 539; *In re Alpharma Sec. Litig.*, 372 F.3d 137, 149-50 (3d Cir. 2004); *In re NUI Sec. Litig.* , 314 F. Supp. 2d 388, 411-15 (D.N.J. 2004) (dismissing CEO and CFO because plaintiff failed to plead *scienter* as defendants were never "informed of the alleged bad debt practice").

[80] *In re Intelligroup*, 527 F. Supp. 2d at 342.

[81] (ECF Doc. No. 19, at ¶ 102.)

[82] We are not convinced of a GAAP violation. An allowance for bad, or uncollectible accounts, is the amount a company sets aside for accounts it believes will not be collected in the future, for whatever reason. On the balance sheet, the allowance is deducted from the company's accounts receivable. When a particular account is determined to be uncollectible, the allowance account is credited and the bad debt expense is debited in the corresponding amount. Here, each balance sheet indicates the company deducted the allowance for uncollectible accounts from accounts receivable. If GAAP requires the allowance be deducted from accounts receivable, it appears USA Technologies, on the face of its balance sheets, complied with GAAP. Again, whether the inability to properly classify various small-balance accounts is a GAAP violation is something we need not decide today.

[83] *In re Intelligroup*, 527 F. Supp. 2d at 286.

[84] (ECF Doc. No. 19, at ¶¶ 106-07)

[85] (ECF Doc. No. 21, at 16.)

[86] *In re Advanta*, 180 F.3d at 540 ("[C]laims essentially grounded in corporate mismanagement are not cognizable under federal law.") (citation omitted).

[87] *Freedman v. Weatherford Int'l Ltd.*, No. 12-2121, 2013 U.S. Dist. LEXIS 135149, *14-19 (S.D.N.Y. Sept. 19, 2013); *In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 829-30 (D.N.J. 2006); *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-1014, 2004 WL 1563024, *1 (E.D. Pa. July 13, 2004).

[88] 2004 WL 1563024, at * 1.

[89] *Id.* at n.3.

[90] *Id.*

[91] *Id.*

[92] *Id.* at *8 n.19.

[93] *Id.* at *8-9.

[94] *Id.* at *9.

[95] (ECF Doc. No. 20-2, at 69.)

[96] (*Id.*)

[97] *See In re Stonepath Grp., Inc. Sec. Litig.*, No. 04-4515, 2006 WL 890767, *15 (Apr. 3, 2006) (finding impact on net income not sufficient to find *scienter*).

[98] 421 F. Supp. 2d at 824.

[99] *Id.*

[100] *Id.* at 825.

[101] *Id.*

[102] *Id.* at 830.

[103] *Id.*

[104] 2013 U.S. Dist. LEXIS 135149, at *2.

[105] *Id.* at *3.

[106] *Id.* at *3-4.

[107] *Id.* at *7.

[108] *Id.* at *9-11.

[109] *Id.* at *18-19.

[110] We find the additional cases cited by Plaintiff to be inapposite. In *Rand-Heart of N.Y., Inc. v. Dolan*, the company's largest customer, who provided over half of all the company's business, stopped sending new work to the company. 812 F.3d 1172, 1178 (8th Cir. 2016). The CEO failed to disclose this information and the court found this reckless as the financial instability due to the loss of the customer's business was "so obvious" the CEO should have been aware of it. *Id.* This is a far cry from the financial situation alleged in the Amended Complaint. Similarly, in *In re Friedman's, Inc. Sec. Litig.*, the complaint alleged specific facts detailing the involvement of the individual executives in reviewing the uncollectible accounts and setting an allowance for

such accounts, along with significant accounting manipulations and collusive conduct.  385 F. Supp. 2d 1345, 1362, 63 (N.D. Ga. 2005).  The Amended Complaint lacks the specificity of the *Friedman's* complaint.  Finally, the court in *Oklahoma Firefighters Pension & Retirement System v. Finisar Corp.* reversed a district court's dismissal of a complaint for failure to plead falsity.  628 F. App'x 530, 531 (9th Cir. 2016).  The court did not even discuss *scienter* and in fact remanded the case for consideration of "whether the complaint states a claim under the remaining elements of a private securities fraud action. 628 F. App'x 530, 531 (9th Cir. 2016).

[111] (ECF Doc. No. 19 ¶¶ 108-112.)

[112] *See* USA Technologies, Inc. Form 8-K, July 24, 2015, *available at* http://www.sec.gov/Archives/edgar/data/896429/000114036115029159/form8k.htm

[113] *See* USA Technologies, Inc. Form 8-K, Aug. 4, 2015, *available at*, http://www.sec.gov/Archives/edgar/data/896429/000114036115029750/form8k.htm.

[114] *See Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (taking judicial notice of relevant SEC filings).

[115] *In re Intelligroup*, 527 F. Supp. 2d at 347.

[116] *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 398 (D. Del. 2010) (finding no such connection), *aff'd* 442 F. App'x 672 (3d Cir. 2011).

[117] *In re Intelligroup*, 527 F. Supp. 2d at 347.

[118] (ECF Doc. No. 19, ¶ 111(c)).

[119] *See* USA Technologies, Inc. Form 8-K, Ex. 10-1, Oct. 20, 2015, *available at*, http://www.sec.gov/Archives/edgar/data/896429/000114036115038085/form8k.htm.

[120] *Id.*

[121] *Id.*

[122] *Id.*

[123] *Id.*

[124] *In re Cyberonics Inc. Sec. Litig.*, 523 F. Supp. 2d 547, 553-54 (S.D. Tex. 2007).

[125] (ECF Doc. No. 21, at 15.)

[126] *See* USA Technologies, Inc. Form 8-K, Ex. 10.1, Jan. 28, 2016, *available at*, http://www.sec.gov/Archives/edgar/data/896429/000114036116049009/form8k.htm.

[127] *Id.*

[128] (ECF Doc. No. 19, at ¶¶ 113-16)

[129] (*Id.* at ¶ 16.)

[130] 2013 U.S. Dist. LEXIS 135149, at \*\*14-19.

[131] 15 U.S.C. § 78t(a); *In re Suprema*, 438 F.3d at 284.

[132] *Shaprio v. UJB Financial Corp.*, 964 F.2d 272, 279 (3d Cir. 1992) ("If no controlled person is liable, there can be no controlling person liability.").